[File No. 7278]

CHARLES VIESTENZ and Ingrid Viestenz, Appellants, v. ARTHUR TOWNSHIP, a Municipal Corporation, et al., Respondents.

(54 NW2d 572)

Opinion filed July 30, 1952

*Roy K. Tedetzke,* for appellants.

*Leland J. Smith,* for respondents.

GRIMSON, J.   This is a suit in equity for a mandatory injunction.   As grounds therefor plaintiffs allege that the defendants in constructing the public highways bounding plaintiffs' lands failed to do that in accordance with scientific highway construction and engineering; that they have obstructed the natural

drainage of the surface waters by the embankments of the highway; that as a result thereof the surface waters from adjoining lands overflow the highway ditches and flood large portions of plaintiffs' land; that plaintiffs suffer irreparable damage therefrom; that they have no adequate remedy at law. They allege further that defendants will continue to keep and maintain said obstruction to the natural flow and drainage of surface waters unless restrained. Plaintiffs ask for an injunction to restrain the defendants from permitting the waters to so accumulate and to order them to remove any obstructions blocking the natural flowage of the surface waters. Upon that complaint, and an affidavit of like content, a temporary restraining order was issued. The defendants make general denial and allege that any accumulation of waters on plaintiffs' lands was not caused by natural drainage but by their own acts in the building of a private drain across their land and in the construction of a private driveway across the ditch along the east side of their land.

The first question that arises is whether a suit of this nature lies against public officers. An injunction will not lie to restrain public officers from the performance of their legal duties. The authorities are uniform, however, in holding that public officers may be restrained by injunction as far as their acts are shown to be in violation of or non-compliance with law when such acts cause irreparable injury and the injured person has no adequate remedy at law. 40 CJS Highways, Sec 199, p 81; People of the State of New York v. The Canal Board of the State of New York, 55 NY Reports 390; Ex parte Young, 209 US 123, 13 LRA NS 932; 5 Pomeroy on Equity Jurisprudence, Sec 321, p 575; Sweigart v. State of Indiana, 213 Ind Rep 157, 12 NE2d 134.

"An injunction to prevent an officer from doing that which he has no legal right to do is not an interference with his discretion." 28 Am Jur, Injunction Sec 166, p 356.

"Private citizens who are specially injured by an obstruction and interested in preventing its continuance may, upon a proper showing, maintain a suit in equity for an injunction. But unless a special injury is shown, the plaintiff will not be entitled to

an injunction. It has also been held that the injury must be irreparable, or at least not capable of full and complete compensation in damages. This is no doubt a fair statement of the general rule, but the phrase 'irreparable injury,' is apt to mislead. It does not necessarily mean, as used in the law of injunctions, that the injury is beyond the possibility of compensation in damages, nor that it must be very great. And the fact that no actual damages can be proved, so that in an action at law the jury could award nominal damages only, often furnishes the very best reason why a court of equity should interfere in cases where the nuisance is a continuous one." 2 Elliott Roads and Streets, Sec 850, p 1108.

Where preventive relief is not adequate to the situation a mandatory injunction for the performance of some act to restore the status quo may lie. While such injunctions are not favored by the courts "it is now well settled that unless prohibited from so doing by some constitutional or statutory provision, a court of equity can, and in a proper case will, award mandatory as well as prohibitive injunctive relief. It may, by its mandate, compel the undoing of those acts that have been illegally done, as well as it may, by its prohibitive powers, restrain the doing of illegal acts." 28 Am Jur, Injunctions Sec 17, p 210.

In the case of State of North Dakota, ex rel. Ladd v. The District Court of Cass County et al, 17 ND 285, 115 NW 675, 15 LRA NS 331, this court had for consideration whether the legality of the acts of the Pure Food Commissioner and whether the powers conferred upon him by the law under which he was authorized to act, might be tested in an action to enjoin him from the commission of acts alleged to be without authority. Many cases bearing on this subject are reviewed (pages 294–295) and the court says:

"These cases establish the principle that a court of chancery has undoubted jurisdiction to interfere by injunction in a case where public officials are proceeding illegally and improperly under claim of right, or where the exercise of such jurisdiction is necessary to prevent a multiplicity of suits, or irreparable injury to property."

In that case Ladd had contended that the courts of this state

"have no authority to entertain an action having for its purpose the enjoining of a public official while executing or claiming to execute a public statute for the public benefit." The statute relied on was Sec 6631 RC 1905 (Sec 32–0505 NDRC 1943) Sec 4 which provides that an injunction may not be granted "to prevent the execution of a public statute by officers of the law for the public benefit." The court construed that statute to mean that "when a suit is tried wherein it is sought to enjoin an officer from executing a statute he shall not be enjoined when found to be regularly and lawfully executing the statute for the public benefit. If acting in excess of, or without, authority, he is not executing the public statute. There must be some method to protect people and property against the unlawful execution of statutes by public officials, and we think the provision referred to was not intended to preclude an inquiry on the part of the courts in a suit to enjoin as to the legality of official acts." This court concludes:

"We are of the opinion that an action instituted in the District Court for an injunction is a proper action by which to determine whether the acts of the food commissioner are in accordance with or in violation of law, and that that court has power and jurisdiction to entertain such an action, and if it found that that official is, under color of law, proceeding in an unlawful manner, and is illegally condemning the products of the millers of the state, it may permanently enjoin him from so doing."

Again in Bartles Northern Oil Co. v. Jackman, 29 ND 236, 150 NW 576, this court said: "When other conditions warrant it, injunction will lie to test the validity of a statute or the lawfulness of the exercise of the powers conferred upon an officer of the law charged with executing it."

Sec 24–0601 NDRC 1943 provides that the "Board of Township Supervisors of any township in the state shall have general supervision over the roads, highways and bridges throughout the township." This is verbatim the provision of Sec 2668 of the 1895 Code. It is the law under which the township roads were constructed during all of the pioneer days and until 1945. The sole consideration in the construction of roads during that time was to make them suitable for travel. As is said in Carroll

v. Township of Rye, 13 ND 458, 101 NW 894, "The highway ditches were not dug for drainage purposes, but are the necessary incidental result of the only practicable method of making the roads fit for travel." Naturally these ditches filled with water. No consideration was given to an outlet for waters so collected. Sometimes the roadway interfered with the natural flow of surface waters. Sometimes such waters were diverted onto lands that were not along their natural drainways. This was especially true in the Red River Valley where the lands are generally quite level and the natural drainways not very definite. This situation had become so serious that seventeen members of the 1945 House of Representatives from the Red River Valley introduced House Bill 269 which was enacted as Chapter 325 SL 1945, now Sec 24–0633 NDRC 1943, for the purpose of correcting this condition. That chapter reads as follows:

"That any and all highways of any kind hereafter constructed or reconstructed by the State Highway Department, any board of county commissioners, any board of township supervisors, their contractors, sub-contractors, or agents, or by any individual firm or corporation, shall be so designed as to permit the waters running into such ditches to drain into coulees, rivers and lakes according to the surface and terrain where such highway or highways are constructed in accordance with scientific highway construction and engineering so as to avoid the waters flowing into and accumulating in the ditches to overflow adjacent and adjoining lands. It is the intention of this act that in the construction of highways, as herein provided, the natural flow and drainage of surface waters shall not be obstructed, but that such water shall be permitted to follow the natural courses according to the surface and terrain of the particular terrain."

By this law those in charge of the construction of highways in addition to making the roads fit for travel must consider the drainage affected by the construction. It is made their mandatory duty to provide drainage towards a natural water course of any water which may accumulate in the ditches along the highway.

Under this law the highways involved in the instant case were constructed. The question then is whether the board of super-

visors in carrying out that work complied with the provisions of this law. If they failed in that respect and obstructed the natural flow of surface waters thereby causing plaintiffs irreparable damage for which they have no adequate remedy at law, their actions, in violation of that law, may be enjoined.

In the case at bar hearing was held upon an order to show cause why the temporary injunction should not be made permanent and upon the evidence so taken it was stipulated that the court should make its final determination in the case. The court found for the defendants and ordered the injunction vacated and the case dismissed. The plaintiffs appeal from the judgment entered thereon and demand a trial de novo. They allege that the evidence is insufficient to sustain the findings and conclusions of the trial court and assign as error the entry of judgment thereon.

The evidence shows that the plaintiffs are, and have for the last five years, been the owners of the S½ of Sec 21, Township 142, Range 52 in Arthur Township, Cass County, North Dakota. This is farm land located about twenty miles west of the Red River where the terrain generally is flat and level. A township road had some years ago been graded east and west along the south edge of plaintiffs' land, a distance of one mile. This roadway was re-built in the late summer of 1950. No culverts were used in the construction of that roadway. In 1946 a ditch and an embankment were constructed on the section line north and south on the east side of plaintiffs' land, jointly by the Soil Conservation Service and the defendants. That embankment was formed into a roadway and joined the east-west roadway at the southeast corner of the plaintiffs' land forming there a square corner. No outlet for any water accumulating there was provided.

The plaintiffs' buildings are located on the Southeast Quarter (SE¼) of plaintiffs' land just east of the quarter line. About 800 feet north of the southeast corner of plaintiffs' land is a low ridge which extends southwest across the south half of plaintiffs' land north of their buildings. At the east side of plaintiffs' land the crest of this elevation or ridge is twenty inches higher than plaintiffs' southeast corner. The evidence shows

that the natural drainage of plaintiffs' land south of this ridge is to the south and east. North of that ridge the drainage is north and east. This elevation or ridge is the divide of the drainage on his land.

There is another elevation or ridge commencing about fifty rods north of plaintiffs' buildings and north of the east-west ridge which runs north and a little east across the western edge of the Northwest Quarter (NW¼) of the Southeast Quarter (SE¼) of plaintiffs' land. There is a break or washout between the two ridges.

The west portion of plaintiffs' land north of the divide is quite flat and lower than the portion east of the north-south ridge. In the fall of 1948 plaintiffs had a ditch dug to drain that portion of their land. That ditch commenced in the northwest corner and angled southeast through the washout between the ridges and then "kind of makes a turn" northeast on the north side of the east-west ridge. They had that ditch deepened in 1949 so that at its deepest point in the washout between the ridges it was four feet deep. Generally the ditch was only one and a half or two feet deep and eight to ten feet wide. It drains the water on plaintiffs' land north of the east-west ridge into the north and south ditch east of plaintiffs' land. The water then flows north along that ditch to a culvert near the northeast corner of defendants' land and through it to a natural drainway.

The evidence shows that about thirty rods west of plaintiffs' southeast corner there are two small potholes which have always been filled with water covering an area of from one to two acres each. Outside of that no noticeable amount of water had accumulated in that corner until after the embankment on the east side of plaintiffs' land was constructed. Before that time the water had drained into sloughs south and east of plaintiffs' corner. Mr. Bradsteen, the engineer in charge, warned the township board at the time of building that north-south grade that unless a culvert were put in where the two embankments joined water would collect there. At one time the township board authorized the placing of a culvert there but afterwards countermanded that order. Since that north-south embankment

was constructed plaintiffs claim that from twenty to forty acres of their lands were covered with water every spring until July and made useless for raising grain.

The defendants claim that as the water from the northwest part of plaintiffs' land flowing in their private ditch came to the north side of the east-west ridge it spilled over that ridge and drained towards the southeast corner of their land to cause the accumulation of that water. Both the plaintiff, Charles Viestenz and Bradsteen, field man and surveyor of the Soil Conservation Service, who had made the surveys for plaintiffs' ditch, testified that a big head of water from the north and west could spill over the east-west ridge. However, the plaintiff, Charles Viestenz, who lives just south of the east-west ridge and naturally most interested in the flow of this water, said he had never seen such an overflow. Defendants' witnesses said they believed the water had overflowed but there was no positive testimony that it had. Bradsteen testified that the ditch could in no way cause such overflow. The ditch itself from one and one half to four feet deep, eight to ten feet wide and fully a mile long would hold considerable water and lower the general level of the water coming towards the ridge from the north that much. To that extent the ditch would lessen the danger of an overflow. Furthermore, the ditch would expedite the flow of the water north of the ridge into the east highway ditch. Clearly the plaintiffs' private ditch instead of causing an overflow of the water over the east-west ridge would tend to prevent that.

Furthermore, the plaintiffs had, prior to the digging of the ditch built dikes eighty rods each way along the northwest corner of their land to prevent the waters from the west and north from accumulating on that low lying section of their land. Then in 1950 a soil conservation ditch and embankment had been constructed north and south along the west boundary of plaintiffs' land for the purpose of draining the water from the west towards the north and away from plaintiffs' land. This indicates that the plaintiffs, instead of causing drainage towards the southeast portion of plaintiffs' land did everything possible to lessen the danger of the water draining that way.

Defendants also claim that the plaintiffs' private driveway

over the ditch on the east side of plaintiffs' land is responsible for this accumulation of water. That driveway is located at the crest of the east-west ridge. It was built on July 3, 1950, just three months before this action was started. All of the water in the southeast corner of which plaintiffs complain had accumulated prior thereto. That private driveway, located as it was on the crest of the ridge, could in no way affect the accumulation of water on plaintiffs' land. The water on the north side flowed north and only the natural drainage on the 800 foot south slope of the ridge could run south. The plaintiffs' private driveway could have no effect on that.

The evidence shows that there was an unusual amount of surface water in the spring of 1950 caused by an extra fall of snow and rain. That, however, would have no bearing on the issues here involved unless the surface waters north of the east-west ridge were sufficiently increased to cause them to overflow the ridge and that such overflow was due to the plaintiffs' private ditch. There is no evidence of such an overflow.

Defendants' witnesses admit that the road embankments act as dikes around that southeast corner and hold the water accumulating in the ditches and cause it to overflow on plaintiffs' land. The defendants concede that the natural drainage from that corner of plaintiffs' land is south and east. As a result the natural flow of surface water has been obstructed at the southeast corner of plaintiffs' land. The plaintiffs by their conduct have not augmented the quantity or accelerated the flow of surface water toward the southeast corner. Solely because of the obstructions created by the township grades water accumulates on and damages the plaintiffs' land and results in the exact situation which Chapter 325 SLND 1945, Sec 24–0633, 1949 Supp to NDRC 1943 is intended to prevent. That law specifically enjoins road constructing officials to construct highways "so as to avoid the waters flowing into and accumulating in the ditches to overflow adjacent and adjoining lands." It further provides: "It is the intention of this act that in the construction of highways, as herein provided, the natural flow and drainage of surface waters shall not be obstructed, but that such water

shall be permitted to follow the natural courses according to the surface and terrain of the particular terrain."

It follows that the action of the township board in so constructing the highways as to permit the accumulation of waters in the ditches to overflow plaintiffs' land was in violation of the law.

The next question is whether the plaintiffs have suffered irreparable damage by the flooding of their land for which they have no adequate remedy at law. That must be determined upon the evidence introduced. 39 Am Jur p 426.

"Ordinarily to warrant injunctive relief, it must clearly appear that some act has been done, or is threatened, which will produce irreparable injury to the party asking for such relief . . . An injury is irreparable when it cannot be adequately compensated in damages, and it is not necessary that the pecuniary damage be shown to be great . . . Acts which result in a serious change of, or are destructive to, the property affected either physically or in the character in which it has been held or enjoyed, . . . do an irreparable injury. . . ." 43 CJS Injunctions, Sec 23, pp 446, 447, 448.

The evidence shows that the plaintiffs own and farm land adjoining the highway. Because of the manner of construction of the highway embankments or grades the ditches thereof overflow with surface waters and flood a portion of the plaintiffs' land. The amount of flooding depends upon the amount of surface waters flowing into the ditches of the highway each spring. Some years there might not be enough to flood any appreciable portion of their land. Other years the flooding will cover as much or more than forty acres. The water affects additional areas around the edges of the flooded portion. Usually such water seeps away by July. Defendants' use of the land is absolutely taken away during such floods. The land covered and affected is made useless for grain farming. The season is then too advanced for raising any grain that year. The soils may be affected. The water becomes stagnant and the area becomes a breeding place for insects. Weeds will grow and the seeds may be carried long distances by the winds. Such an area

of stagnant water often becomes a real nuisance to the immediate surroundings.

"A wrongful interference with waters or water rights, the wrongful ponding or casting of water upon the premises of another, or an unsanitary, disagreeable, harmful, or dangerous condition caused by an accumulation of water, or by the pollution thereof, may constitute a nuisance." 56 Am Jur Waters, Sec 432, p 847.

Moreover, the flooding of the plaintiffs' land because of the unlawful acts of the defendants disturbs the plaintiffs in their possession of the land during each flooding and constitutes trespass. 52 Am Jur Trespass, Sec 11, p 843. As the flooding may appear every year that becomes an intermittent trespass each year.

The plaintiffs have the right to sue for damages for the trespass on their land by the unlawful acts of the defendants and for the nuisance created by the flooding of their lands. That, however, would mean an action every year the waters flooded their land. The actual duration of the flooding and the area covered may differ every year. A recurrent suit for damages is not an adequate remedy under the circumstances. Only in a court of equity can the situation be dealt with adequately and with justice to all concerned.

"As a general rule, where an injury committed by one against another is continuous or is being constantly repeated, so that the complainant's remedy at law requires the bringing of successive actions, that remedy is inadequate and the injury will be prevented by injunction. The fact that an injured person has the right of successive actions for the continuance of the wrong does not make it an adequate remedy at law which bars the jurisdiction of a court of equity to grant an injunction to restrain the continuance of the injury." 43 CJS, Injunctions, Sec 24, p 449.

"The wrongful flooding of land may be enjoined, in a proper case. Such flooding has frequently been restrained on the ground that it constitutes a continuing, or recurrent trespass or nuisance." 56 Am Jur, Waters, Sec 442, p 857.

"Where the nuisance is continuous or recurrent an injunction may be granted, since a suit at law is an inadequate remedy be-

cause damages could be recovered only at the time of the bringing of the action and a multiplicity of suits would be necessary." 39 Am Jur, Nuisances, Sec 158, p 428.

In the case of Byram et al. v. Lawein, 57 SD 403, 232 NW 907, involving the discharging of water onto plaintiffs' land by the defendants, the South Dakota Court says: "Defendant has no right to drain any water other than the natural surface water on the plaintiff's right of way. . . . The fact that the damage is but trifling does not authorize the refusal of an injunction where the trespass is a continuing one. 40 Cyc 656. Equity looks chiefly to the nature of the injury inflicted and the fact of its constant repetition or continuation, rather than to the magnitude of the damage resulting." Citing cases. See also Little Falls Fibre Co. v. Henry Ford & Son, 212 NYS 630; Farrell v. City of Ontario, 36 Cal App 754, 173 P 392; Hoglino v. Giorgetta, 20 Colo App 338, 78 P 612; O'Brien v. Murphy, 189 Mass 353, 75 NE 700; Davis v. Frankenlust Twp. 118 Mich 494, 76 NW 1045; Stone v. Roscommon Lumber Co. et al., 59 Mich 24, 26 NW 216; Rueckert v. Sicking, 20 O App 162, 153 NE 129.

In Heath v. M. St. P. & S. S. M. R. Co. et al., 126 Minn 470, 148 NW 311, the court said: "The defendants so constructed and maintained an embankment on the right of way that at every heavy rainfall destructive quantities of sand and material therefrom were cast upon the adjoining land of plaintiff. This constituted a continuing trespass and nuisance, entitling plaintiff to an injunction and damages."

In Lake Erie and W. R. Co. v. Young, 135 Ind 426, 41 Am St Rep 430, 35 NE 177, the court held: "Where a railroad company has begun the construction of an embankment across a natural stream, with a culvert insufficient to permit the passage of the water in times of rain and melting snow, an injunction will issue at the suit of the landowner whose land will be flooded from year to year, and who would otherwise be compelled to bring numerous suits for damages for the continuous injuries."

In the case of White et al. v. N. C. & St. L. Railway, 1 Tenn App 467, it was held: "Where a railroad had built a fill or embankment which stopped the natural drainage, but provided a

culvert to take care of the water and in later years through natural causes the culvert was filled up and could no longer be made to drain complainant's land and the water collected there and destroyed the use of the land, and soured adjoining land and formed a breeding place for mosquitoes, held a mandatory injunction would issue to compel defendant to put in a culvert to drain the land."

This rule also applies against a municipality. In the suit of Cromer v. City of Logansport, 38 Ind App 661, 78 NE 1045, the court held: "Where plaintiff's property was damaged during every recurring ordinary rainfall by surface water accumulated by defendant's street improvements for which no proper outlet had been provided, plaintiff was entitled to an injunction to restrain the future recurrence of such injury."

In Bartles Northern Oil Co. v. Jackman, 29 ND 236, 150 NW 576, this court said: "Although a legal remedy may be adequate for any single act of trespass or any single wrong, yet when such acts or wrongs are continuous in their nature, and the entire wrong may be prevented by injunction, that form of proceeding is preferable to one at law, because full compensation for the entire wrong cannot be obtained in one action at law."

We have come to the conclusion under the circumstances shown to exist in this case that the plaintiffs have suffered an irreparable injury for which they have no adequate remedy at law.

The plaintiffs are therefore entitled to an injunction restraining the defendants from maintaining the highways along plaintiffs' land in such a manner as to impound surface waters on their land. They are also entitled to a mandatory injunction directing the defendants to construct or alter the highway grades or ditches, or both, so as to provide for the outlet of surface waters from the plaintiffs' land and prevent the recurrent overflow of the land herein involved by waters flowing in or accumulating in the highway ditches.

There is some evidence that an outlet for the accumulated waters may be obtained by placing a culvert through the embank-

ment of the east and west highway at the southeast corner of plaintiffs' land and deepening the ditch toward the south along the section line.

The evidence also indicates that if the plaintiffs' private driveway, which appears to have been constructed without authority, is removed, the ditch towards the north from the southeast corner of plaintiffs' land along the east side of their land may be deepened through the east-west ridge to provide an outlet towards the natural drainage to the north and east.

The best method, however, of finding an outlet for these waters must be determined by the township board in accordance with good engineering practices as provided in Sec 24–0633 NDRC 1943. See also Ritter v. Drainage District No. 1, 148 Nebr 873, 29 NW2d 782, 788.

The judgment of the District Court is reversed and the case remanded for further proceedings in accordance herewith.

MORRIS, C. J., and SATHRE, J., concur.

CHRISTIANSON, J. (dissenting). This is an action for an injunction to compel the defendants to remove certain obstructions to the flowage of surface water from lands belonging to the plaintiffs,—which obstructions it is alleged resulted from the improper construction of highway ditches; and to enjoin the defendants from in any manner obstructing the free flowage of surface waters over and across said lands and to restrain them from permitting water to accumulate in highway ditches so as to overflow adjacent lands belonging to the plaintiffs. The case was tried to the court upon the issues framed by the complaint and the answer. Fourteen witnesses including the plaintiff, Charles Viestenz, and all three members of the township board appeared and testified. The trial court after due consideration made findings of fact and rendered judgment denying an injunction and ordering a dismissal of the action.

In Strobeck v. McWilliams, 42 ND 30, 171 NW 865, this court said:

"The remedy by injunction is summary, peculiar, and extraordinary, and lies only to prevent great and irreparable mischief. It is not *ex debito justitiae* for any injury threatened or

done to the estate or rights of a person. But a granting of it must always rest in the sound discretion, governed by the nature of the case. The power, being extraordinary, ought to be exercised with great caution and only in very clear cases. And it is also necessary that there should be some special circumstances to bring the case under some recognized head of equity jurisdiction."

"Equity reserves its injunctive process for the protection of property or other rights against actual or threatened injuries of a substantial character which cannot be adequately remedied in a court of law. That is to say, the jurisdiction or power to grant injunctive relief should be exercised only when intervention is essential effectually to protect property or other rights of which chancery will take cognizance against irreparable injuries. . . . Suitors may not resort to a court of equity to restrain acts, actual or threatened, merely because they are illegal or transcend constitutional powers, unless it is apparent that irremediable injury will result. The mere assertion that apprehended acts will inflict irreparable injury is not enough. The complaining party must allege and prove facts from which the court can reasonably infer that such would be the result." 28 Am Jur, Injunctions, Sec 47, pp 242–243.

"Injunctive relief is not a matter of right, but its grant or refusal usually rests in the sound discretion of the court, exercised in harmony with well established principles." 43 CJS, Injunctions, Sec 14, p 420. *"The court which is to exercise the discretion* is the trial court and not the appellate court." 43 CJS, Injunctions, p 426.

"An injunction is an extraordinary proceeding, the propriety of the allowance of which depends upon a variety of circumstances aside from the strictly defined right of the complainant, and it is therefore uniformly held that the granting or refusal of an injunction, either preliminary or final, is not a matter of right, but rests in the sound judicial discretion of the trial court, to be exercised according to the facts and circumstances of each case, and its discretion will not be interfered with unless a palpable abuse is shown." 13 Standard Encyc. of Procedure, p 118.

"Courts of equity exercise discretionary power in the grant-

ing or withholding of their extraordinary remedies. Although this discretionary power is not restricted to any particular remedy, it is particularly applicable to injunction, since that is the strong arm of equity and calls for great caution and deliberation on the part of the court. By statutory provision, of course, a positive duty may be imposed upon the court to grant injunctive relief when certain specified conditions are made to appear. But in the absence of such provisions, there is ordinarily no absolute right to injunction. The relief is not given as a matter of course for any and every act done or threatened to the person or property of another; its granting rests in the sound discretion of the court, to be exercised in accordance with well-settled equitable principles and in the light of all the facts and circumstances in the case, of which the presiding judge has a right to require a full and candid disclosure, and if he is satisfied that this has not been done, he may refuse to exercise his extraordinary power. The rule is not confined to relief of a prohibitory character, but extends to mandatory injunctions as well." 28 Am Jur, Injunctions, Sec 35, pp 230–231.

Plaintiffs are the owners of the S½ of Section 21–142–52 (Arthur Township) having purchased the same from Hugo Viestenz, the father of the plaintiff Charles Viestenz, in October 1946. The farm buildings are located about the middle of the farm. The land is quite flat although there are two small ridges or elevations. One ridge runs diagonally in a northwesterly direction from the buildings on the farm. The east-west ridge connects with the north-south ridge about 50 rods north of the buildings. According to the testimony of Bradsteen who made a survey of the premises the east-west ridge is some two feet four inches higher than the road on the section line on the south side of the farm. The testimony shows that prior to the time that the plaintiffs acquired the land the wettest portion of the land was in the northern part of the SW¼ and that ordinarily this could not be cultivated and seeded as early as the land on the SE¼. Apparently this condition was due in a large measure to the fact that waters from lands adjoining on the west and north overflowed onto this quarter section, and the plaintiff Viestenz proceeded to construct and did construct a dam or

dike along the west and north boundaries of the NW¼ from the northwest corner of the NW¼ running some 80 rods north and south along the west side and some 80 rods east and west along the north boundary thus shutting off the flow of surface waters that otherwise would have come upon the NW¼ from the north and from the west.

In 1950 a highway was constructed on the section line on the west side of plaintiffs' farm. Plaintiff, Charles Viestenz, testified that this was a Soil Conservation Project and that "four of us farmers paid the bill on the road." Apparently plaintiff was interested in the construction as an additional barrier to prevent waters from the west flowing over onto his land. He said, "I didn't pay anything for building the ditch. All I agreed to pay was for filling the road." According to his testimony the road was to continue north along the section line and it was understood that no culverts were to be placed in the road until it had reached the point where, or beyond where, it intersected the section line running east and west on the north side of section 21 and thus assure that water from the west side of the highway would not be permitted to get to the east side of the highway along plaintiffs' land.

In 1948 the plaintiffs proceeded to construct a ditch beginning near the northwest corner of the SW¼ and running generally in a southeasterly direction up to a ridge north of the buildings on plaintiffs' farm, then in an easterly direction to the ditch along the west side of the highway on the section line on the east side of plaintiffs' land. According to the testimony of the plaintiff, Charles Viestenz, he contacted the chairman of the board of township supervisors with respect to the installation of a culvert in such highway and such culvert was constructed in 1948 at a point about 30 rods south of the north boundary of the southeast quarter section and the ditch constructed by the plaintiff entered the highway ditch on the west side of such highway some distance south of the culvert so that the water from the ditch ran in the highway ditch on the west side of the highway until it reached the culvert that had been installed, ran through the culvert into the ditch on the east side and then ran north in

the ditch on the east side of the highway to a natural coulee or drainway,—apparently about one-half mile father north.

In the summer and fall of 1946 a Soil Conservation project was undertaken whereby a grade was constructed on the section line on the east side of plaintiffs' land with a ditch on each side of the highway. One Bradsteen, an employee of the Soil Conservation Service, testified that he made a survey before the construction was undertaken and that Federal funds available for the construction of Soil Conservation projects were expended in the construction of the project. He testified further:

"Q. The township had nothing to do with putting it in, is that right?

"A. The township was there when we put it in.

"Q. What do you mean 'was there'?

"A. The town board.

"Q. Is it not true that the town board had nothing to do with it whatsoever? They didn't have anything to do with it as to hiring the contractor, as to supervising the work, or as to deciding what land should be drained by that ditch? Isn't it a fact that was all decided by your office, and that you supervised the work, and that the work was done by Mr. Iwen?

"A. That is right. . . .

"Q. The road and ditch are not separated in any way?

"A. That is right. They paid eight cents a yard for the yardage of dirt moved.

"Q. This is a government subsidy?

"A. That is right.

"Q. Which is guaranteed on the theory that it is taking care of some drainage problem?

"A. That is right.

"Q. And that was true in 1946, although it was a little different sort of setup?

"A. If they didn't survey it and they drained what we figured—

"Q. I don't care what you figured. It was a government sub-

■■■■■■■■■■■■■

sidy guaranteed on the theory it was going to take care of some drainage problem, that was the justification for it?

"A. That is what it was set up for.

"Q. This agency would not have guaranteed the money to build a road?

"A. No.

"Q. The idea was to build a ditch and use the dirt from the ditch to make a road, but the road was a sort of sideline, as far as the theory of the payment of this money was concerned?

"A. That is right.

"Q. But the actual application for the road and the arrangements for the road, and all that, was carried on by the farmers or landowners who owned land adjacent to the road with your agency or organization?

"A. That is right."

He also testified that he understands that the township paid the contractor with money received from the Soil Conservation Service plus some money from its own funds. One of the township supervisors testified that the township contributed from its funds $34 and the balance of the expenditure was apparently defrayed by Soil Conservation funds. Bradsteen testified that he told the township board that "if we didn't put the culvert one way or another in that corner it would cause a bottleneck there." He did not state to what member or members of the board this statement was made. One of the supervisors testified that no such statement had been made to him and that he did not know of any such statement.

At the time the highway and ditches were constructed on the east side of plaintiffs' land in 1946 no culverts were installed and apparently it was contemplated and understood by the members of the township board that the water in the highway ditches would drain north. Bradsteen testified that incident to the construction he made a survey to see if the water from the southeast corner of the SE¼ would go north. He does not state the result of the survey but according to his testimony ditches may be constructed so that the water in the ditches along the east side of the SE¼ will drain either north or south, but he stated

that in order to make water run north a ditch would have to be constructed for a short distance at a greater depth than if the water is made to flow south. One of the township supervisors testified that the purpose of the construction of the project along the section line on the east side of plaintiffs' premises was to have the water run north. Plaintiff Viestenz testified that in the spring of 1947 he conferred with the township board with respect to drainage where water was backing up on his land in the southeast corner. When asked as to what drainage he described or requested at that time he stated it was a culvert at each end of the ditch,—one at the low spot a little ways south of the north boundary of his land (apparently at the point where a culvert was subsequently installed) and another culvert at the south end of plaintiffs' land. The north culvert was installed in the spring of 1948 approximately 2300 feet north of the southeast corner of plaintiffs' land and north of the point where the ditch which plaintiffs constructed from the northwest corner of the NW¼ empties into the highway ditch on the west side of the highway and the water runs north in the highway ditch on the west side of the highway until it reaches the culvert and then runs through the culvert from the west side ditch to the ditch on the east side of the highway and continues to flow north in the east side ditch until it reaches a natural draw or coulee further north. The plaintiff Viestenz also testified that in 1947 he contacted the chairman of the township board with respect to the installation of a culvert at or near the southeast corner of plaintiffs' land and that he was furnished with such culvert but that later the chairman of the township board or some member thereof stopped him from installing the culvert and it was not installed. All three members of the township board testified, and their testimony shows that farmers adjacent to plaintiffs' land on the east, south and southeast objected to the installation of a culvert at the southeast corner of plaintiffs' land. A meeting was held with respect to the matter at which parties affected were heard and after the meeting the township board decided that the plaintiff should not install the culvert and it was not installed. There is considerable evidence indicating that the installation of such culvert would result in flooding

lands south and east of plaintiffs' land and in one instance in the flooding of premises where the farm buildings are situated.

There is testimony including that of the chairman and one of the members of the board of supervisors to the effect that if a culvert were installed at or near the southeast corner of plaintiffs' land as requested by the plaintiff and as he claimed should have been done, the water would overflow the premises of one farmer, that there was no outlet and that the water would remain around his farm buildings unless there was a very large quantity of water in which case the water would run north, but that a great deal of the water would remain on the premises so flooded. The plaintiff Viestenz testified that the north culvert which had been installed in 1948 was to be replaced by a larger one. He testified:

"A. We had talked to the drainage (township) board and they had agreed to dig the ditch out to run the water north over this ridge in the land.

"Q. What water?

"A. The south water was to be run up—through the ditch, through this hill.

"Q. In order to do that, this ridge had to be dug out so there would be an incline towards the north?

"A. Yes.

"Q. But that was never done?

"A. No."

The plaintiff Viestenz testified that he did not believe he asked the township board to furnish a larger culvert to replace the north culvert that had been installed in 1948. He further testified: "Q. Did you have someone do it for you, did you have someone talk to the board in your behalf? A. My father and Clark Lincoln, I believe, discussed it. I did not send him to do it, but that deal was mentioned. Q. You say you didn't know anything about it? A. I didn't say I didn't know anything about it. I knew they were working to drain the water from the south side north." The plaintiff Viestenz also testified that he received an order from the township board for the larger culvert but did not get the culvert and have it installed. Plain-

tiff also testified that on July 3, 1950, he built a driveway across the ditch on the west side of the highway on the east side of plaintiffs' land. That he built such driveway without consultation with or permission of the board of supervisors of the township and that the driveway blocked the ditch so that no water will flow either way.

The chairman of the board of township supervisors testified that in the spring of 1950 Hugo Viestenz, plaintiff's father, negotiated with the township board to have the north culvert replaced by a larger one. He testified that the culvert that was installed in 1948 was an 18-inch culvert and that they wanted a 24-inch culvert and that he gave them (Viestenzs) an order for such culvert. The plaintiff Viestenz testified that he received such order from his father but that he never called for the culvert. The chairman of the board of township supervisors testified that in the spring of 1950: "Mr. Hugo Viestenz came to my place and wanted to know if they could dig it out and give them a bigger culvert and they thought that would take care of it. We agreed to it and gave them an order for a larger culvert, and we figured everything was settled."

"Q. So the first thing was that Hugo Viestenz asked permission to deepen the ditch on the north and south road on the east side of the land?

"A. That is right.

"Q. And did they do that?

"A. They did some there. I was not up there, but they did some work there.

"Q. Do you know at what point they wanted to deepen it?

"A. Not exactly. I couldn't say just exactly what point, but I imagine it was where this ridge is they talk about.

"Q. Through the high point?

"A. Yes, through the high point there.

"Q. Have you been over there since this driveway was built into the Viestenz land?

"A. Yes.

"Q. Is that built at approximately the hight point?

"A. Approximately."

Ordean Berg testified that he was employed by the United States Soil Conservation Service and that his district included Arthur Township. He testified that on the day the trial of this action began he went out to Section 21 in Arthur Township at the request of the township board and made a survey of the highway ditch along the highway on the east side of plaintiffs' land. According to the evidence he commenced at the southeast corner of plaintiffs' land and stayed in the ditch on the west side of the highway until he reached a point approximately 2300 feet north of the southeast corner of the SE¼ where the culvert had been installed. At this point he crossed over the highway and made measurements in the ditch on the east side of the highway until he reached a coulee approximately 4000 feet north of the southeast corner of plaintiffs' land. Berg testified that he reduced the measurements to a profile map which he identified and which was marked as exhibit A and introduced in evidence. He testified that the measurements shown thereon were taken at the time indicated and that they represent the bottom of the ditch and the elevation to the edge of the land adjacent to the ditch. He identified a point shown on the map about 2300 feet north of the southeast corner of the SE¼ and stated that at that point there was an 18-inch metal culvert running east and west through the road. He identified further a place some 1500 feet south of the culvert which he stated was an approach or "drive-in,"— a place or roadway where you could drive from the highway across the ditch and onto the land. He also identified a place which he had marked as being the lowest point in the land in the southeast corner of Section 21, situated between the buildings on the plaintiffs' land and the southeast corner. He testified that the bottom of the culvert was a foot and two tenths lower than the southeast corner of plaintiffs' land, and that it was also lower than the low spot or pothole or slough on the southeast portion of the SE¼. When asked as to the elevation or natural slope of the ditch from the approach or "drive-in" toward the south he stated that it was "about level. Well, there is a couple of tenths." When asked by plaintiffs' counsel "there is a slight elevation toward the south on the south side of the approach?"

he answered, "Well, when you get between one-tenth and two-tenths you can say it is about level."

The testimony shows that Berg had an assistant in making the survey and recording the measurements shown on the profile map and that Berg took a reading every 100 feet and the plat shows the elevations of the bottom of the ditch for each 10 foot length of the distance surveyed.

Bradsteen did not question the correctness of the survey and measurements made by Berg and apparently he had made so similar survey. Bradsteen testified:

"Q. There has been some testimony here about the drainage of the south portion of the ridge on the Viestenz farm being north. Have you made any survey with reference to that?

"A. Well, we didn't go very far. I think they went farther. They went up to a coulee where it could be drained. (This apparently refers to the survey made by Berg on the day of the trial incident to the preparation of the profile map which Berg prepared and which was introduced in evidence.)

"Q. Would you say it is practical to drain the south portion, south of the ridge, in a northerly direction?

"A. Well, I don't know. It is not much land.

"Q. What?

"A. There is not a great deal of land there. Depend whether they figure it would be worth the money to put a ditch in. . . .

"Q. If the water is run north into this slough, do you think that would be a practical solution?

"A. You would have to have it surveyed and find out what the cost was going to be. . . .

"Q. As between these two courses, of going south with this ditch, and going north by a deep ditch, which one would you say would be the most advisable?

"A. That would be up to the fellows there. I wouldn't say."

The township supervisors did not plan or design the highway or the highway ditches. The survey and the plans were made by the employees of the Soil Conservation Service. According to the evidence the township supervisors were under the impression that the project would be constructed so that the water

in the highway ditches along the east side of plaintiffs' land would flow north. When the plaintiff Viestenz in 1947 asked that a culvert be installed at the southeast corner of his land he was at once furnished with a culvert by the township board for such installation but when this became known protests were made by farmers adjacent to plaintiffs' land on the east and southeast. A meeting was called and held at which the parties affected were heard and after such meeting the township board decided that the plaintiff should not install a culvert at the southeast corner of his land because of the likelihood that this would result in flooding and damage to lands as contended by the persons who objected to the construction of the culvert. The plaintiff Viestenz also requested that a culvert be installed through the highway grade near the north end of his land and such culvert was provided by the township supervisors and installed in 1948 apparently at the place desired by the plaintiff. The culvert was installed at a point approximately 2300 feet north of the southeast corner of plaintiffs' land and some distance north of the place where the ditch which the plaintiffs constructed, commencing near the northwest corner of their land, would empty into the highway ditch on the west side of the highway and the water so emptied would flow north through such ditch until it reached the culvert, then flow through the culvert on the east side of the highway and then flow north into a coulee or natural draw. Plaintiff commenced to construct the ditch to drain his land in 1948 and finished it in 1949. He testified that the arrangement thus made and the emptying of the water from the ditch into the highway ditch and the flowage of the water through the culvert resulted in satisfactory drainage. The township supervisors were further contacted on behalf of the plaintiffs in the spring of 1950 with respect to having a larger culvert installed in place of the culvert that had been installed in 1948. Plaintiff's father contacted the chairman of the board of supervisors and asked permission to deepen the ditch at a point about 800 feet north of the southeast corner of the land, where a so-called ridge, approximately twenty inches higher than the southeast corner of the land, was located so that the water from the southeastern portion of plaintiffs' land would drain north through the high-

way ditch on the west side of the highway to the culvert then through the culvert to a ditch on the east side of the highway and then in such ditch north to a coulee. The township supervisors granted the request and plaintiff's father was given an order for the larger culvert which he in turn delivered to the plaintiff. The plaintiff did not install the culvert and there is nothing to indicate that he notified the township supervisors of abandonment of such proposed installation; but on July 3, 1950, the plaintiffs without communication with or authorization from the township supervisors proceeded to construct and did construct an approach or driveway across the ditch on the west side of the highway at the highest point on the so-called ridge and thus effectively blocked the flow of water in such ditch.

In the fall of 1950 shortly before this action was instituted Charles Viestenz contacted the chairman of the board of township supervisors and again requested that a culvert be installed at or near the southeast corner of his land. This request or demand was apparently made preliminary to the institution of this action. Such culvert has not been installed. There is no contention and no proof that the defendants have any desire to embarrass or injure the plaintiffs or that they have been actuated by any improper motive or purpose. They first authorized the installation of such culvert and furnished the culvert for installation but upon protests being made to its installation they held a meeting at which the parties affected were heard. There apparently was and is a difference of opinion as to how the situation should be dealt with. The township supervisors apparently were and are of the belief that the water can and should be drained to the north and the plantiff Charles Viestenz is apparently of the view that the water north of the driveway which he has installed should be drained north but that the water south of the driveway should drain south and that a culvert should be installed at the south end so that the water that would flow into the highway ditch south of the driveway would flow through such culvert. It is undisputed that any water that accumulates on the southeast portion of plaintiffs' land does not result from the obstruction of a water course but that such water is surface water and is water that fell on the southeast portion of

such land either in the form of rain or snow. The chairman of the board of township supervisors testified that they supposed that the matter had been taken care of when at the request of plaintiff's father they furnished a larger culvert to be installed in place of the culvert that had been installed in 1948 some 2300 feet north of the southeast corner of plaintiffs' land, and had authorized the deepening of the highway ditch so that the water in the ditch would drain north. Much of the testimony relates to the spring of 1950, and all of the photographs showing waters on the tract of land in question were taken in the spring of 1950 and it is undisputed that that was an abnormally wet spring and that much land in that part of the State was under water and that seeding was greatly delayed.

What is the injury plaintiffs claim had been and will be caused to plaintiffs' lands by reason of the alleged obstructions to the free flowage of surface waters? Plaintiff testified that between 25 and 30 acres in the southeast corner of the SE¼ had been flooded and he estimates there are about 15 acres of what he terms "marginal lands." There is no further explanation of this latter term. Plaintiff Charles Viestenz testified that in 1949 and again in 1950 he farmed 21 acres of the area which he says is being flooded. Bradsteen testified that after the ditch which the plaintiff constructed from the northwest corner of the NW¼ and which empties into the ditch on the west side of the highway at a point south of the culvert that had been installed across the road in 1948, and by reason of the east-west ridge lying south of such ditch and the drainage which the ditch carries that between 30 and 40 acres are affected by the runoff of surface waters in the southeast portion of the SE¼. The undisputed testimony shows that within this 30–40 acre area there is situated the lowest point on the farm of the plaintiffs. This point is located by the plaintiff some 30 rods west of the southeast corner of the SE¼. Plaintiff referred to it as a slough or potholes. According to the testimony including that of the plaintiff such potholes cover some 2 or 2½ acres. Bradsteen testified that he made a survey to determine whether the potholes could be drained north and apparently he arrived at the conclusion that this should not be undertaken. He testified the potholes could

be drained north if the ditch was dug deep enough. When asked if he thought the township should drain these potholes he answered that he did not and that he had not given an opinion to that effect. He said "that pothole will always have water in it, even if they put the culvert across the road." He was then asked, "You are of the opinion the pothole should be drained somewhere?" He answered, "No, I am not." Plaintiff's father, Hugo Viestenz, testified that the east-west road on the south side of plaintiffs' land had been graded quite a number of years ago. (The road was regraded in 1950.) There is no testimony as to the height or type of grade to which Hugo Viestenz referred. With respect to the character of the land he testified: "I remember a good many times when the low spot Charles talked about, about thirty rods west of that corner, I remember when that was a bad place to get through, because it was so water-logged and so soggy we had difficulty getting through. That is nothing new to me." The plaintiff Charles Viestenz testified that the drainage which is taken care of by the ditch which he constructed and which empties into the highway ditch south of the culvert and flows through the culvert to the ditch on the east side of the highway is satisfactory, so the only part of the land which he claims to have been adversely affected by the highway or ditch construction is the 30–40 acre tract in the southeast corner of the SE¼.

The evidence shows that there was a slough or potholes in the 30–40 acre tract in the southeastern corner of plaintiffs' land which had never been cultivated, and that there was other land within such tract, the exact area of which is not shown, which had been so "wet and soggy" in past years that it was difficult to get through. The 30–40 acre tract in the southeastern portion of plaintiffs' land, which is said to have been flooded was not near the farm buildings and was not devoted to any particular or special use so as to give it any special value. The property did not have some peculiar quality so as to fit it for some particular use so that recovery of its pecuniary value would not fairly recompense the owner for the loss of the use thereof. The damages were measurable by definite pecuniary

standards well established and settled in the laws of this state, and there is no contention that the party liable for the damages is insolvent. There is no uncertainty as to the standard for measurement of the damages and no difficulty in making proof. The damages can readily be established and recovered in an action at law. There is no irreparable injury. The records of this court show that in many instances actions at law have been held or found to be an adequate remedy where injuries resulted from the flooding of lands or from other interference with the use and enjoyment thereof, and where the situations presented were far more complex and where it was more difficult to ascertain and prove damages than it would be here.

In King v. Stark County et al., 66 ND 467, 266 NW 654, plaintiff brought action to enjoin the county, the State Highway Department and the State Highway Commissioner from constructing a certain highway grade seven feet high on a highway on a section line between the dwelling house and barns on plaintiff's farm which grade would come within a few feet of the buildings and result in cutting the dwelling house off from the other buildings and would destroy the feeding plot, and it was asserted that as a result plaintiff would be required to travel a long distance in order to go from the house to the barns. The trial court enjoined the defendants from building the grade until such time as the damage which would result was ascertained and such damages paid to the plaintiff or into court for him as provided by law. This court reversed the decision of the district court and held that the plaintiff was not entitled to injunctive relief. Thereafter, the highway grade was constructed and plaintiff and his wife brought action to recover compensation for the property claimed to have been taken or damaged by the defendants for public use in the building of the highway. This court held that the complaint stated a cause of action. King v. Stark County et al., 67 ND 260, 271 NW 771. Thereafter such proceedings were had in this latter action that judgment was rendered in favor of the plaintiff and against the defendants for $4500. See Lamb v. King, 70 ND 469, 296 NW 185.

Such judgment was later paid. King et al. v. Baker, State Auditor, et al., 71 ND 125, 299 NW 247.

In Mayer v. Studer & Manion Co. (66 ND 190, 262 NW 925) action was brought against the County of Stark, the State of North Dakota and the State Highway Commissioner for damages alleged to have resulted to plaintiff's land because of the negligent construction of a culvert and grade on a public highway adjacent to plaintiff's land. It was alleged that as a result of the negligent and defective construction plaintiff's farm and the buildings thereon were damaged, that plaintiff had presented a claim for the damages in due form but allowance thereof had been refused. The trial court held that the complaint stated a cause of action. This court reversed the order of the trial court and held that an action did not lie against the defendants for negligence and that as the action was predicated upon negligence the complaint failed to state a cause of action. This court further held that where the State takes or damages private property for public use without legal exercise of the power of eminent domain the aggrieved party may recover compensation for the property thus taken or damaged, and the case was remanded to permit the plaintiff to amend the complaint so as to seek recovery of compensation for the property taken or damaged. Mayer v. Studer & Manion Co., 66 ND 190, 262 NW 925. Thereafter, the plaintiff amended his complaint accordingly and such proceedings were had in the action that the plaintiffs recovered judgment for damages, which judgment was subsequently paid. See King v. Baker, State Auditor, et al., 71 ND 125, 299 NW 247.

In Donaldson v. Bismarck, 71 ND 592, 3 NW2d 808, the plaintiff brought action to recover damages alleged to have been sustained as a result of the establishment, maintenance and operation by the City of Bismarck of a public dump near the farm owned and occupied by the plaintiff. Damages were sought for permanent injuries to the real property and for the annoyance, inconvenience and discomfort to the plaintiff by the establishment, maintenance and operation of the dump. The trial of the action resulted in an award to the plaintiff of $3500 for damages for permanent injuries to the real property and $250

for annoyance, inconvenience and discomfort. A somewhat similar situation was involved in the following cases: Olson v. Armour & Co., 68 ND 272, 280 NW 200; Weir v. Armour & Co., 68 ND 281, 280 NW 204; Haugen v. Armour & Co., 68 ND 282, 280 NW 204; Paseka v. Armour & Co., 68 ND 283, 280 NW 205. Each of those cases was brought to recover damages alleged to have been sustained as a result of the operation of a slaughtering establishment and packing plant by the defendant along the Sheyenne River, resulting in interference with the use and enjoyment of the premises of the plaintiff in each of these cases on account of the pollution of the waters and the foul and noxious odors created by the pollution. Recovery was had by the plaintiffs in all of the cases and the judgments were affirmed by this court.

In Jacobs v. United States, 290 US 13, 78 L ed 142, action was brought to recover damages alleged to have resulted from the occasional overflowing of agricultural land, in consequence of the construction of a dam by the United States. In that case the Supreme Court of the United States held that the intermittent overflowing of agricultural land, in consequence of the construction of a dam by the United States, amounted to a partial taking for which just compensation was required under the constitutional right to just compensation for private property taken for public use. There apparently was no difficulty in establishing the amount which the owner of the land was entitled to recover and the remedy at law was found to be adequate.

According to the evidence plaintiffs' land is quite level and the two ridges referred to are narrow strips of ground rising above the level of the lands generally. The evidence shows that the ditch which plaintiffs constructed beginning near the northwest corner and running across to the east side and emptying into the highway ditch was dug through one of the ridges. The testimony is to the effect that the so-called east-west ridge is approximately 20 inches higher than the southeast corner of the plaintiffs' land. The highway and the highway ditch cross this ridge, approximately 800 feet north of the southeast corner, at the point where the plaintiff Charles Viestenz has constructed

the approach or driveway. It was at this point (where the highway intersects the ridge) that Hugo Viestenz, plaintiff's father, in the spring of 1950 asked the permission of the township supervisors to dig the highway ditch deeper and at the same time asked that a larger culvert be installed in place of the one which had been installed in 1948 at a point approximately 2300 feet north of the southeast corner of plaintiffs' land. Charles Viestenz testified that he did not believe he asked the township board to furnish the larger culvert but that he believes his father discussed it with the chairman of the board; that he did not send him but that the deal was mentioned and that he knew "they were working to drain the water from the south side north." Mr. Lincoln, the chairman of the board of supervisors, testified that they gave Hugo Viestenz an order for the bigger culvert and that they figured everything was settled. The plaintiff Charles Viestenz testified that his father gave him the order but that he did not get the culvert. Elsewhere plaintiff Charles Viestenz testified, "we had talked to the drainage (township) board and they had agreed to dig the ditch out to run the water north over this ridge in the land." The chairman of the township board testified, "Hugo Viestenz came to my place and wanted to know if they could dig it out and give them a bigger culvert and they thought that would take care of it. We agreed to it and gave them an order for a larger culvert and we figured everything was settled." This latter testimony was not denied. According to the evidence the driveway which plaintiff built approximately 800 feet north of the southeast corner completely blocks the ditch and all water entering the highway ditch north of such driveway including the water from the ditch constructed by the plaintiffs which drains a large portion of his land flows in the ditch on the west side of the highway until it reaches the culvert, then flows through the culvert to the ditch on the east side of the highway and flows in such ditch until it empties into a coulee approximately 4000 feet north of the southeast corner of plaintiffs' land. This coulee is apparently a natural outlet and is so situated that no harm is done to any adjacent owners and no objection has been raised by anyone to the water emptying into such coulee. According to the testimony of Berg who

apparently holds a position with the Soil Conservation Service superior to that of Bradsteen the highway ditch on the west side of the highway east of plaintiffs' land is 1.2 feet lower at the culvert that was installed 2300 feet north of the southeast corner than it is at the southeast corner of the SE¼.

It is apparent from the evidence that there is no great obstacle to having the water drain north. When Bradsteen was asked if it is practical to drain the water from the southeast portion of plaintiffs' land in a northerly direction he said, "Well, I don't know. It is not much land. There is not a great deal of land there, depends' whether they figure it would be worth the money to put a ditch in." Apparently any doubt that Bradsteen had as to whether it was practical to have the water drain north was based on a consideration of whether in view of the small quantity of land involved it was worth the expenditure rather than whether it was practical from an engineering standpoint. The plaintiff Charles Viestenz apparently does not desire to have a ditch constructed so that the water from the southeast corner of his land will run north. It probably would be more convenient for him to have the driveway which he has constructed and which operates as a dam in the ditch remain as it is, than to have the ditch made deeper at this particular point so as to permit the water from the south to run north which apparently it would do according to the testimony of Berg inasmuch as the southeast corner of plaintiffs' land is actually 1.2 feet higher than the bottom of the culvert installed some 1500 feet north of the driveway and it is probable that the ditch and culvert could be lowered if that were needed so as to make more of an incline toward the north. There is no claim that there is not adequate fall for the water that now runs through the culvert. While the plaintiff says he did not ask the board of township supervisors for a larger culvert he does admit that he knew his father had talked to the chairman of the board about it. He also knew that there was under consideration the deepening of the ditch at the point where the highway ditch crossed the so-called ridge. His father had asked for and received an order for the larger culvert, and plaintiff admits that the father turned such order over to him and that he received

it but did nothing further about it. So far as the record shows he did not notify the board of supervisors of his unwillingness to cooperate with the plan which his father had proposed and the township supervisors had accepted until in the fall of 1950 when he again demanded that the culvert be installed at the south end.

There is no reason to believe that the township supervisors desire to do anything but their duty and to treat all owners of land adjacent to the highway fairly. They granted the request of the plaintiff Charles Viestenz for the installation of the north culvert and also for the south culvert but when protests were received from farmers who believed that the installation of the south culvert would operate to the injury of land owners south and east of plaintiffs' land the supervisors called a meeting so that all persons affected might be heard.

After considering the views that were presented at the meeting the supervisors determined that the south culvert ought not to be installed. This took place in 1947. In 1948 the north culvert was installed. In the spring of 1950 the negotiations were had relating to the installation of a larger culvert in place of the north culvert and for the deepening of the ditch at the point of the so-called ridge approximately 800 feet north of the southeast corner. The proposal for this improvement was made by Hugo Viestenz, plaintiff's father, and the supervisors showed their full willingness to cooperate and solve the problem in the manner suggested. The plan was not carried out. The reason why does not appear but the plaintiff Viestenz on July 3, 1950, constructed the drive-in or approach across the ditch at the place where it had been planned to have it deepened so as to assure the flow of the water from the south to the north.

According to the evidence the water from the southeast corner of plaintiffs' land and indeed all water that would drain into the highway ditch on the west side of the highway from the southeast corner to the north boundary line of plaintiffs' land can be drained north. In fact, all the water that drains into the highway ditch along the east side of plaintiffs' land is drained north and flows in the highway ditches and empties into a coulee some 4000 feet north of the southeast corner of plain-

tiffs' land, with the exception of the water south of the approach which plaintiffs constructed across the highway ditch approximately 800 feet north of the southeast corner.

The water which is so drained north includes not only the water that naturally gathers on this land from rain and snow that falls on it and from drainage from the ground but also the water that is drained by the ditch which the plaintiffs constructed from the northwest corner of the farm to the highway ditch along the west side of the highway on the east side of the land. Apparently no one is harmed by this drainage and no complaint has been made. However, the evidence indicates that if the water is drained south it is likely that the premises of farmers living south and southeast of plaintiffs' land will be flooded and greatly injured, and this was the contention of those who protested against the installation of a culvert at the southeast corner of plaintiffs' land. The evidence clearly indicates that the eastern part including the southeast corner of plaintiffs' land can be drained north in the highway ditch. This is quite clear from the testimony of both Berg and Bradsteen. The question as to the drainage is primarily one of engineering but the evidence is far from satisfactory as to in which direction the water should be drained. The only survey that seems to have any degree or reliability or substance is the one that was made by Berg and this survey indicates that the general level of the land is such that the only interference with the flowage of the water from the southeast corner of plaintiffs' land to the north is the so-called ridge,—a narrow strip of land located approximately 800 feet north of the southeast corner and which strip rises some 20 inches above the general level of the adjacent land. The evidence indicates that if the ditch through this ridge is deepened so as to compensate for the height of the ridge that then the incline of the ditch so constructed is toward the north.

Under the evidence in this case it seems as likely, if not more likely, that good engineering practices would require that water from the southeast corner of plaintiffs' land be drained to the north and not to the south. In this case there was a full and fair hearing at which in all 14 witnesses appeared and testified, including the plaintiff, all three members of the township

board and a number of farmers residing in the immediate vicinity. After such trial the trial court determined that injunctive relief should not be granted and that the preliminary injunction which had been issued at the beginning of the action should be dissolved.

As has been pointed out it is a fundamental principle that in actions of this character the trial judge is vested with wide discretionary power. It cannot be said upon the record presented on this appeal that the trial court abused its discretion. The judgment appealed from should be affirmed.

This action was tried in the fall of 1950 and much of the evidence related to conditions said to exist in 1950. The evidence shows that in the spring of 1950 there was an unusual amount of surface water in that locality resulting from heavy snowfall during the preceding winter and that as a result a great deal of land was flooded. We have no means of knowing what has transpired since the action was tried or what the present conditions are. There is disagreement as to whether the water from the southeast portion of plaintiffs' land should be drained south or should be drained north. Reference is made in the majority opinion to the evidence bearing on this question. The evidence does not establish to any degree of certainty which way the water should be drained "in accordance with good engineering practices." The trial court in view of all the facts and circumstances in the exercise of his judgment and discretion determined that the injunction should be denied. For reasons which I have set forth fully I believe that the trial court's decision should be affirmed. It seems to me that in any event final judgment should not be ordered or rendered as provided by the majority. If the judgment is not affirmed, then the cause should be remanded to the district court to the end that authoritative and reliable surveys might be made by engineers skilled in this type of work and thus reliable information obtained and evidence adduced as to what construction is necessary to furnish the necessary drainage, so that the controversy might be disposed of in light of conditions as they actually exist.

BURKE, J. I concur in the dissent of Judge Christianson.