Florence M. **LITTLE**, Plaintiff and Appellant,

v.

**BURLEIGH COUNTY**, North Dakota, a Public Corporation, Defendant and Respondent.

No. 7569.

Supreme Court of North Dakota.

April 9, 1957.

Rehearing Denied May 11, 1957.

Rausch & Chapman, Bismarck, for appellant.

Harold L. Anderson, State's Atty., Burleigh County, Bismarck, for respondent.

GRONNA, District Judge.

This is a trial de novo of an action by a landowner against a county upon "implied contract" under Sec. 14 of the North Dakota Constitution which provides that "private property shall not be taken or damaged for public use without just compensation having first been made to, or paid into court for the owner, * * *."

In 1950, at a purchase price of $399, plaintiff acquired title to a small parcel of pasture land (13.38 acres) through which a county highway had been constructed in 1914. The highway subdivided the parcel into two pieces (11.4 and 1.98 acres). A 6-foot culvert had been installed where the highway crossed a creek, and when the culvert was full during spring runoff, a ditch to divert surface water which spilled from the creek during floodstage, onto the land of another, provided a cutoff across a small neck of land inside an oxbow or U-shaped bend in the creek channel. In October 1952, without instituting condemnation proceedings, Burleigh County took a small strip of right-of-way, 1.144 acres, for relocating said county-highway grade,

the 6-foot culvert in the old grade having been washed out in 1952 by the annual spring runoff of melting snow and ice. Nearly an acre more, a crescent-shaped wedge, lay between the old and new grades. Thereby (a) a curve in the highway was straightened, and (b) the ditch was deepened, and tripled in width, thus averting washouts such as had eroded the old grade during spring runoffs. Only two 2-foot culverts were installed in the 1952 grade, which increased the flow through the cut-off-ditch crossing plaintiff's driveway, a prairie trail, on the south boundary line, which provides a way of access to plaintiff's adjoining farm, west of the 13.38 acres parcel. At floodstage, the ditch always has been so *muddy* that such spot in the driveway always has been difficult or even impassable for vehicular travel. Since October 1952, the township has constructed a rough-surfaced, rock-paved ford across the muddy ditch.

Previously, in 1925, plaintiff had acquired title to her adjoining farm, 130 acres of pasture land, situated in the same quarter-section as the 13.38 acre parcel but separated therefrom by a railroad embankment. Plaintiff claims (but the trial judge found that she had failed to prove) that the 1952 grade, including the improved ditch, flooded such adjoining land near her farm buildings, and is causing further eroding, deepening and widening of said ditch, thereby causing consequential damages to her land in the total sum of $4,000. Plaintiff also claims that $400 is the market value of the right-of-way taken, and that severance damages to the remainder of the 13.38 acre parcel amounts to $1,500. Said landowner brought this action for damages in the total sum of $5,900. A jury having been waived, the action was tried without a jury. This is an appeal by plaintiff from judgment in her favor for $600 plus interest, costs and disbursements. Plaintiff deems such award of $600 inadequate, and she demands a trial de novo. Defendant asks that judgment be affirmed.

Upon a trial de novo, under the provisions of NDRC 1943 28–2732, the Supreme Court must ascertain the facts from the record before it, but in making its determination, the findings of fact of the trial court are entitled to appreciable weight. In this case, the trial court's findings of fact as to (a) the market value of the strip of land taken for highway purposes, (b) severance damages and consequential damages to the remainder, and (c) consequential damages to plaintiff's adjoining farm caused by the construction of the relocated grade, were the result of deliberate weighing of conflicting opinion evidence of all of the witnesses, as shown by the trial judge's memorandum opinion, and such fact findings are entitled to appreciable weight. Lineburg v. Sandven, 74 N.D. 364, 375, 21 N.W.2d 808, and 813. After all, a judge, sitting on the trial bench, draws his conclusions not only from the statements of witnesses but from his observations of their demeanor as well. He is in a much better position to judge the weight and credibility to be accorded the witnesses than is an appellate court which has only the cold record before it. Klundt v. Pfeifle, 77 N.D. 132, 41 N.W.2d 416. During the trial of this case, the judge personally viewed and inspected the premises, which further aided him in understanding and applying the evidence adduced on the trial.

In constructing such a public improvement, the county was acting as an agency of the State, and became obligated to the landowner upon "implied contract" under the eminent domain provisions of Section 14 of the State Constitution, supra. Mayer v. Studer & Manion Co., 66 N.D. 190, 195, 262 N.W. 925; Schilling v. Carl Tp., 60 N.D. 480, 491, 235 N.W. 126, 131; Jacobson v. State, 68 N.D. 259, 262, 278 N.W. 652, 653.

The State has consented to be sued in cases "arising upon contract", NDRC 1943, 32–1202, which includes an implied as well as an express contract. Jacobson v. State, supra.

■ Where a county, having lawful right to enter and take lands by eminent domain for public use by paying just compensation therefor, does not enter in conformity to law, but the owner waives such feature and treats it as if the law had been followed, with only the question of compensation to be settled, the law of "just compensation" under eminent domain applies as if condemnation proceedings were begun and not yet completed. Schilling v. Carl Tp., supra, 60 N.D. at page 491, 235 N.W. at page 131.

■ Although the provisions of N.D. Const. Section 14, supra, do not define the words "taken or damaged" and "just compensation", as used therein, such terms are defined by NDRC 1943, Section 32–1522. Accordingly, compensation for property actually taken, and damages for property not taken but injuriously affected, must be ascertained and assessed pursuant to the provisions of such statute. Lineburg v. Sandven, 74 N.D. 364, 21 N.W.2d 808; Wishek Investment Co. v. McIntosh County, 77 N.D. 685, 45 N.W.2d 417 and Minnkota Power Co-op. v. Bacon, 80 N.D. ——, 72 N.W.2d 880. Section 32–1522, supra, reads in part as follows:

"Assessment of Damages. The jury, or court, or referee, if a jury is waived, must hear such legal testimony as may be offered by any of the parties to the proceedings and thereupon must ascertain and assess:

"1. The value of the property sought to be condemned and all improvements thereon pertaining to the realty and of each and every separate estate or interest therein. If it consists of different parcels, the value of each parcel and each estate and interest therein shall be separately assessed;

"2. If the property sought to be condemned constitutes only a part of a larger parcel, the damages which will accrue to the portion not sought to be condemned by reason of its severance from the portion sought to be condemned and the construction of the improvement in the manner proposed by the plaintiff;

"3. If the property, though no part thereof is taken, will be damaged by the construction of the proposed improvement, the amount of such damages;"

■ The above statute makes a distinction between damages due and damages not due to the taking of property. Thus, paragraph 1 provides, in effect, that for the taking of property, damages shall be ascertained and assessed for "the value of the property", which means the market value.

"Market value" may be defined as the highest price for which property can be sold in the open market by a willing seller to a willing purchaser, neither acting under compulsion and both exercising reasonable judgment.

■ Paragraph 2 provides for severance damages, that is to say, the depreciation in market value of the remainder of a parcel, caused by the severance of the part taken.

The foregoing constitute damages due to the taking itself.

Paragraph 2 of the statute, 32–1522, further provides for consequential damages to the remainder *not* due to the taking itself but arising by reason of the use to which the part taken has been put, that is, to the "construction of the improvement" thereon. Thus, under paragraph 2, damages may include not only severance damages but also consequential damages.

Paragraph 3 provides, in effect, for consequential damages, with reference to which the problem of differentiating between damage that is due and damage that is not due to the "taking" chiefly arises, inasmuch as such damages are never due

to the "taking". Instead, they always arise from injury to other property, though no part thereof is actually taken. Consequential damages, allowable under paragraph 3, arise from injuries to other property not actually taken, caused by the construction of the public improvement. King v. Stark County, 67 N.D. 260, 265, 271 N.W. 771, 774, cited in 29 C.J.S., Eminent Domain, § 111, n. 49.

The principal issues herein are questions concerning the adequacy of the amount of the judgment. There are four questions for determination:

(1) What is the market value of the 1.144 acre strip taken from the 13.38 acre parcel? and (2) What is the amount of (a) severance damage and (b) consequential damage to the remainder of such parcel? and (3) What are the consequential damages to the plaintiff's adjoining 130 acre parcel caused by the construction of the relocated grade in October, 1952? and (4) Does the statute, 32–1522, supra, contain provisions for business expense, namely, the additional transportation expense between plaintiff's farm buildings and the highway caused by the increased flow of floodwater through the ditch crossing plaintiff's driveway, thereby causing access to be temporarily cut off?

With respect to questions 1 and 2 (a), the trial judge ascertained and assessed the value of the 1.144 acre strip "taken" at $200, and severance damages to the remainder of the 13.38 acre parcel at $150, making a total of $350. Such findings of fact are sustained by the evidence, which is that in 1950 plaintiff purchased such 13.38 acre parcel for $399 or $30 an acre; and that a real estate broker from nearby Bismarck, called as a witness by the defendant, expressed the opinion that the market value was not more than $25 an acre.

Questions 2(b), 3 and 4 concern consequential damages, if any, allegedly caused by the relocation of highway grade in 1952.

Before deciding these questions, we shall set forth the facts in detail.

The topography of Northeast Quarter of Section 24, Township 141, Range 80, in Glenview Township, Burleigh County, is rolling hills and meadows, so that it is suitable only for pasture and not for cultivation. The topography of the surrounding land is similar.

In 1904, the Soo Railway constructed an embankment and tracks, entering the village of Baldwin in the northeast corner of the Northeast Quarter, and proceeding in a south-southwesterly direction until the tracks intersected the quarter line, at which point there is a railroad crossing, 492 feet west of the southeast corner of Northeast Quarter.

The railway right-of-way, including the embankment and drainage ditches, is 100 feet in width. The area of the Northeast Quarter occupied by (a) the village, (b) the railway station grounds therein, and (c) the railway right-of-way south to the quarter line, is 13.33 acres.

The source of Burnt Creek, a small non-navigable stream with a narrow, shallow channel, is eight miles straight north of the Northeast Quarter and about 12 miles by meander line. It flows through lowlands and meadows among rolling hills. After heavy winter snows, the spring runoff of surface water may become enormous, spill out of the creek channel, and flood meadows and lowlands, including the highways therein. During the spring of 1950, water rose to the top of the railway embankment in the Northeast Quarter where the railway trestle, 61 feet long and with 6-foot clearance, spans the creek.

Burnt Creek enters the Northeast Quarter a short distance west of the village of Baldwin, continues south until it reaches a slough east of the plaintiff's farm buildings, located about one-eighth of a mile west of the trestle. From the slough, Burnt Creek flows east under the railroad trestle and, prior to 1914, it continued

to flow unobstructed in an easterly direction into Crofte Township for a number of feet. Then the creek channel bends toward the south, then west into the northeastern part of the Southeast Quarter. Thus, the channel is an oxbow or U-shaped loop or bend at this point.

About 1914, County Highway No. 6, known as the "Black Trail", was constructed between Wilton and Bismarck. It proceeded south through Baldwin, parallel to and adjacent to the east side of the railroad embankment, until it reached a point 576 feet from the quarter line. Thence it curved away from the embankment, across Burnt Creek, then southeast to the township line at the southeast corner of the Northeast Quarter, thus forming a road shaped like a hockey stick. (Hereafter the term "southeast corner" will refer to such corner of the Northeast Quarter).

Where it crossed the creek, the 1914 road was only about 50 feet east of the railroad trestle. At this point a 6-foot metal culvert was installed, permitting flow into the oxbow, and another 6-foot culvert was installed down south, about two tenths of a mile, where the creek oxbow flowed westward into the Southeast Quarter of Section 24.

The reason why two 6-foot culverts were installed in 1914, instead of two bridges of the same length (61 feet) as the railway trestle, was because the cost thereof would have been, and would be today, prohibitive — as much as $40,000 for the two.

Although a 2-foot culvert would have been, and now is, sufficient for the normal flow of the creek, obviously the 6-foot culvert was a hopelessly inadequate conduit for floodwater flowing under the trestle. So, in 1914, a ditch was constructed on the west side of the road, thereby diverting floodwaters toward the south upon the Southeast Quarter (never owned by the plaintiff) where it spread over meadowland

and returned to the creek channel. This ditch constituted a cutoff or short cut across the neck of land inside the oxbow. (Hereafter the terms "ditch" or "cutoff" will refer to such flood-channel ditch.)

As indicated above, in 1904 the 160 acres of the Northeast Quarter were divided into two separate parcels by the railroad embankment: (a) the one to the west of the embankment being 129.64 acres, title to which was acquired in 1925 by the plaintiff for $3,000 and (b) the other, to the east, was 17.03 acres in area.

In 1914 a total of 3.65 acres of such 17.03 acres were used in constructing County Highway No. 6 together with the ditch between the railway and the highway. Thus the size of the parcel was reduced to 13.38 acres. This was uncultivated prairie land or meadow. It is a triangular-shaped parcel, adjacent to and immediately south of the village of Baldwin, population about 65. The 1914 highway, shaped like a hockey stick, subdivided it into two pieces or parcels. 11.4 acres to the north of the curve was, and is, suitable only as a small pasture for a few head of livestock, such as cows. A wedge of only 1.98 acres remained south of the curve, its west side being the railroad embankment, and its south boundary being the quarter line between the railroad crossing and the highway, a distance of 492 feet. This remnant, being too small for pasture or cultivation was, and is, of small value. In 1950, plaintiff purchased such two pieces, totalling 13.38 acres, for $399 or $30 an acre. Defendant called as a witness a real estate broker from nearby Bismarck who expressed the opinion that the market value was not more than $25 an acre.

The above statement of facts is illustrated by the following map, Exhibit "A", showing the railroad embankment, the 1914 highway, Burnt Creek, and the 1952 relocation of grade.

LITTLE v. BURLEIGH COUNTY
Cite as 82 N.W.2d 603

Front

BALDWIN

Wilson Ave.
ac.19 ac.24

St.

Station Grounds

M. St. P and Sault Ste Marie R.R. Right of Way

Section Line

3.65 Acres

1140 Acres

N 7°35' E

BURNT   CREEK

1.98 Acres

SECTION 19
T. 141, R 79

SECTION 24
T. 141, R 80

Although plaintiff purchased the 130 acre parcel west of the railroad embankment in 1925, she did not purchase the 13.38 acre parcel on the east side until 1950. Consequently it was not until 1950 that plaintiff became an "abutting property owner" with respect to said county highway. In 1950, when plaintiff first became an abutting owner, her private driveway leading from her farm buildings to such highway was along the quarter line between the Northeast Quarter and Southeast Quarter. (Hereafter the terms "quarter line" and "driveway" alone will refer thereto, and particularly to the 492 foot strip between the railroad crossing and the highway). Furthermore, that has been her driveway and means of access to the highway ever since the grade was relocated in October 1952. However, in the fall of 1951, at the plaintiff's specific request, the county built an approach immediately south of the 6-foot culvert, between the highway and the nearby railroad embankment, so that plaintiff could drive south (upon the 1.98 acre wedge) about 450 feet until she reached her driveway at the railroad crossing. This approach acted like a dam or dike during the 1952 spring runoff, causing the earth fill around the 6-foot culvert to wash out, and the culvert to be washed up on the prairie. This prompted the relocation of the grade to the east.

Such 1952 relocation of grade, not only eliminated the sharp curve, but it also resulted in the removal of most of the old curve, and in a wider and deeper ditch. (In 1948 this ditch had been widened and deepened and the old grade was raised about 2 feet). In October, 1952, the old 1914 grade was excavated to a depth of about 6 feet below the top of the grade. Such excavation was made commencing about 100 feet south of the creek. Consequently, the extensive excavation (a) deepened the ditch several feet, and (b) tripled its width and (c) thereby lessened the pressure that caused the old grade to wash out and (d) improved the drainage of plaintiff's 130 acre adjoining farm.

Although a 6-foot culvert was installed in the 1914 grade, only two 2-foot culverts were installed in the 1952 grade, and thus the flow of floodwaters to the south, through the ditch, was increased, but not exceeding the difference in capacity between one 6-foot culvert and two 2-foot culverts.

After the 1952 relocation was completed the county improved two approaches to plaintiff's driveway: (1) at the southeast corner and (2) the other, 150 feet north of the southeast corner, the latter being the better access way. Such driveway is an unimproved road, being a mere prairie road, namely, two ruts made by vehicle wheels. The driveway approaches the highway at grade level, and likewise approaches the railroad crossing at grade level. However, there is a low point where the ditch crosses the driveway, such ditch being 40 feet wide, with gently sloping sides, and 2 feet deep at the center. From the highway at the southeast corner, going west, the driveway descends gradually to the center of such ditch, 200 feet away, such low point being about 4 feet below the top of the grade. From the railroad crossing, going east, the driveway descends gradually to the center of such ditch, 292 feet away, such low point being about 7 feet below the top of the crossing. So the driveway provides a wide, flat-V channel. Such low point in the ditch is the usual flow-line, however.

Ever since the 1914 highway was constructed, such ditch, or cutoff, has been the only channel for floodwater emerging from the railroad trestle, and, being unpaved, the low spot in the driveway has been too muddy for vehicles to cross without difficulty, even to the extent of getting stuck in the mud during floodstage. After the completion of the 1952 grade, such muddy spot continued to be such for only a short time longer than previously. Recently township officers of Crofte Township constructed a rock-paved ford across the muddy ditch, but the surface thereof is rough and rocky.

■ With respect to question 3, we are of the opinion that the only consequential damage to plaintiff's adjoining 130 acre parcel, caused by the construction of the relocated grade in October, 1952, was the injury to the driveway resulting from the increased flow of water across her access road. The trial court did not find the amount of this damage. Instead he found that the damage could be eliminated by the construction of a permanent ford with a concrete surface across the ditch. He also found that the cost of such construction would be about $250. In lieu of this item of damage, he allowed the plaintiff $250 "to construct her own road across the watercourse". We agree that the construction of a permanent ford across the watercourse would make plaintiff's access road passable at all times except in times of very high water. It would in fact be an improvement which would give the plaintiff better access to her farm than she has had at any time since she purchased it. The estimate of the trial court as to the cost of the ford was apparently made by the court as a result of observations he made upon a visit to the site during the trial of the case. There is, however, no competent evidence in the record as to what such a ford would cost. In the absence of any evidence thereon we cannot affirm the finding of the trial court as to the cost of the ford although we agree that it was proper for the court, in lieu of an award for continuing consequential damages to her farm to award the plaintiff a sum of money which would enable her to eliminate such damages. It is the owner's duty to curtail his damage and if it can be curtailed the court will measure the damages by the cost of the curtailment. Oneida v. Hail, 21 Tenn.App. 70, 105 S.W.2d 121, 122.

■ Plaintiff's claim of consequential damage by flooding to her adjoining 130 acre farm has not been proved. In constructing the relocated grade, the county was bound by its duty to furnish drainage to plaintiff's adjoining farm, *equal* in capacity and efficiency to that existing prior to the relocation, but it was not under a duty to furnish *perfect* drainage.

Except for the increase of flow of floodwater resulting from the reduced capacity of the culverts in the new grade, the county highway authorities had observed their statutory duty to provide drainage towards a natural watercourse. Such authorities had the right, as well as the duty, to continue to use the same drainage ditch that had been constructed 38 years before, during which time it had been in continuous use during flood stages. Laws 1945, Ch. 325, being NDRC 1949 Supp., 24–0633, which is now superseded by Laws 1953, Ch. 177, sec. 58, being NDRC 1953 Supp., 24–0306; Viestenz v. Arthur, Tp., 78 N.D. 1029, 1034, 54 N.W.2d 572, 575; 40 C.J.S., Highways, § 186 b, p. 61; 25 Am.Jur., 392, Highways, sec. 87; 29 C.J. Highways, § 319, p. 591, citing Carroll v. Rye Tp., 13 N.D. 458, 101 N.W. 894.

As previously stated, the improved ditch actually improved the drainage of plaintiff's 130 acre adjoining farm. Nevertheless, we shall consider further the plaintiff's claim that the 1952 road embankment raised the level of the slough, situated adjacent to her farm buildings. First, we shall describe her farm, which she purchased in 1925 for $3,000 and which she contends to have been worth $9,000, because of buildings and other improvements, immediately prior to October, 1952. Plaintiff contends that because of the 1952 road embankment, the value of such farm has depreciated in the amount of $4,000.

Since 1925 she has resided upon and operated this farm, which consists of uncultivated hills and meadows, suitable only for pasture. Her income is derived principally from cattle, either as beef or producers of milk, and from poultry and poultry products. She and another woman do the work on the farm. Plaintiff testified that during the winter time she usually has about 30 head of cattle of Holstein breed; that although the pasture supplies forage for the livestock through the summer months, she

has to haul in hay and feed from outside of the farm. She further testified that she sells her cream in Bismarck, and does her hauling in a half-ton truck; and that during the year of 1954 she could not use the truck from the commencing of the spring thaw until July 28, 1954, because she "could not cross the creek", meaning the muddy ditch which is now paved with rock. Plaintiff further testified that she had to haul her cream out to the road in a two-wheel cart, and to carry it through the water and mud, meaning the muddy ditch. Plaintiff further complained that the slough, through which the creek runs, was so deep that her cattle had to swim from the barn to the pasture; that although no cattle have yet been lost through drowning, the possibility remains as an ever existing one. As previously indicated, it is our opinion that this unfortunate situation (assuming it actually existed) was not caused by the relocation of grade in October, 1952.

■ With respect to question No. 4, the statute, 32–1522, supra, does not allow damages for increased business expense, as such (e. g., transporting farm produce across a muddy ditch), although if this should depreciate the market value of plaintiff's land, such evidence would become material on that issue. See 18 Am.Jur., Eminent Domain, Sec. 259; 29 C.J.S., Eminent Domain, §§ 162, 163, 164 and 167.

■ ■ Returning to question No. 3, concerning consequential damage, plaintiff insists that she shall be compensated for the destruction of the 1951 approach to her driveway, which approach was adjacent to the 6-foot culvert in the road, and the railroad trestle, and parallel with the creek. Plaintiff contends, in effect, that this denial of that access way amounted to a denial of her right of access to and from the highway. This claim too must be denied for four reasons: (1) Because the construction of such approach was an error in judgment and should never have been constructed inasmuch as it caused the washout of the highway in the spring of 1952; (2) Because the destruction of the 1951 approach did not constitute a *denial* of the plaintiff's right of access to and from the highway; and (3) Because the county has provided two other adequate approaches to her driveway at the nearby quarter line. See 25 Am.Jur., Highways, secs. 153 and 154; 39 C.J.S., Highways, § 141, p. 1081; 40 C.J.S., Highways, § 186, p. 60; and (4) In King v. Stark County, 66 N.D. 467, 266 N.W. 654, this court held:

"An abutting owner has the right of ingress or egress to such highway subject to the paramount right of the state to improve and control the highway in the interest of the public; but such owner cannot insist on this right of ingress and egress at any place he sees fit as he holds this right subject to the superior right of the state."

In the light of the principles stated we have carefully considered the whole record and have reached the conclusion that the judgment of the district court should be affirmed in all respects except as to the award of $250 to defray the cost of building a permanent ford across the ditch in plaintiff's access road in lieu of consequential damages. This case is therefore remanded to the district court for the purpose of determining the consequential damages to plaintiff's land or in the event it is found that the building of a ford will curtail such damages, the cost of building such ford. Upon the making of its findings upon these issues the district court will amend the judgment herein to allow the plaintiff, either consequential damages, or in case it is found that the cost of an improvement which will eliminate such damages is less than the amount of the damages, the amount of the cost of such improvement.

GRIMSON, C. J., and BURKE, SATHRE, and MORRIS, JJ., concur.