618 N.W.2d 166 (2000)
2000 ND 181
James FANDRICH, Julie Knodel, and Walter Fehr, Petitioners, Appellants, and Cross-Appellees,
v.
WELLS COUNTY BOARD OF COUNTY COMMISSIONERS, Rusland Township Board of Township Supervisors, Forward Township Board of Township Supervisors, and Wells County Water Resource Board, Respondents, Appellees and Cross-Appellants.
No. 20000054.
Supreme Court of North Dakota.
October 26, 2000.
*168 Joseph J. Cichy, Olson Cichy, Bismarck, for petitioners, appellants, and cross-appellees.
Gary R. Wolberg, Fleck, Mather & Strutz, Bismarck, for respondents, appellees, and cross-appellants.
NEUMANN, Justice.
[¶ 1] James Fandrich, Julie Knodel and Walter Fehr ("landowners") appealed from an amended judgment approving a flood control plan adopted by the Wells County Board of County Commissioners, Rusland Township Board of Township Supervisors, Forward Township Board of Township Supervisors, and Wells County Water Resource Board (collectively referred to as "County"). The County cross-appealed, challenging the trial court's failure to award it attorney fees, costs and disbursements. We conclude the trial court did not err in approving the flood control plan and did not err in refusing to award attorney fees, costs and disbursements to any of the parties. We affirm.

I
[¶ 2] The landowners own property along the James River in Wells County. In May 1997, the landowners petitioned the court for a writ of mandamus ordering the County to provide sufficient openings through its roads so they do not act "as dams and obstructions to the flow of water," because the existing openings allegedly *169 were inadequate to prevent flooding of their property. The landowners identified several road crossings they believed required improvement. Following a hearing, the trial court dismissed the landowners' claim for monetary damages, but granted the writ of mandamus. The writ required the County to inspect, study and adopt a flood control plan for the road crossings on or before April 30, 1999, which would permit "a maximum quantity of water to flow freely and unimpeded in the James River in accordance with the determination of the North Dakota State Water Commission and the laws" of North Dakota. The court also awarded the landowners "their statutory costs, reasonable engineering costs, reasonable deposition costs and one-half of their attorney fees." No appeals were taken from this judgment.
[¶ 3] The County timely adopted a flood control plan with proposed improvements for the various road crossings and had the plan published in the official county newspaper. The landowners moved the court to review the County's plan to determine if it met the requirements of the writ of mandamus and filed their objections to the plan. The court held a hearing in September 1999, and conducted an onsite viewing of the crossings with the parties and counsel. In February 2000, the trial court approved the County's flood control plan, but revised it by incorporating a stipulation requiring all culverts not at riverbed level to be placed at riverbed level. The court did not grant any of the parties attorney fees, engineering costs or statutory costs. These appeals followed.

II
[¶ 4] The landowners contend the trial court erred in approving the County's flood control plan because it did not comply with the writ of mandamus.

A
[¶ 5] The trial court's issuance of the writ of mandamus was not appealed and is not questioned in this appeal. Rather, the issue is whether the County complied with the writ's requirement that it adopt a flood control plan and make reasonable efforts to implement the plan in accordance with state law and the determination of the State Water Commission.
[¶ 6] Generally, a writ of mandamus may be issued to compel official action by a government entity, but not to control official discretion in acting. See Midland Produce Co. v. City of Minot, 70 N.D. 256, 257, 294 N.W. 192, 193 (1940); Standard Oil Co. v. Engel, 55 N.D. 163, 174, 212 N.W. 822, 826 (1927). Thus, while a court may issue a writ ordering a government entity to comply with applicable law, it cannot control the government entity's discretion in determining the method to be used in complying with the law. See State v. Coordinating Board for Higher Education, 802 S.W.2d 533, 535 (Mo.App.1991); State v. Troy Civil Service Commission, 118 Ohio App. 345, 194 N.E.2d 778, 780 (1963). The writ in this case did not control the County's discretion in developing the methods proposed to comply with the writ and state law.
[¶ 7] Because the issue in this case is whether the County complied with the court's order, our standard of review is structured by the court's order itself. We are required to review the County's discretionary actions in determining the methods to be used in complying with the law. The discretionary actions of government entities are not beyond the scope of judicial review, but we apply a very deferential standard to correct abuses of that discretion. See Abrahamson v. Amos, 245 N.W.2d 888, 891 (N.D.1976). In reviewing a decision by a local government entity, a court must not substitute its judgment for that of the government entity, but rather must determine whether the entity erroneously exercised its discretion. Shaw v. Burleigh County, 286 N.W.2d 792, 797 (N.D.1979). We independently review the local government's actions, and we apply *170 the same standard of review as the district court to determine whether the local government's action comports with a correct interpretation of the law and whether the local government has acted in an arbitrary, capricious, or unreasonable manner. Water Resource District v. Burleigh County, 510 N.W.2d 624, 627 (N.D.1994). A decision is not arbitrary, capricious, or unreasonable if the exercise of discretion is the product of a rational mental process by which the facts and the law relied upon are considered together for the purpose of achieving a reasoned and reasonable interpretation. Anderson v. Richland County Water Resource Board, 506 N.W.2d 362, 367 (N.D.1993).

B
[¶ 8] There are five road crossings at issue in this case. They are unpaved township roads that have been in use for more than 50 years. The sites are known in this litigation as 1, 2, 3, and 5-6. Sites 5-6 have been considered as one site for purposes of the County's proposed alterations. The James River in this part of Wells County flows from south to north. Sites 5-6 lie furthest to the south. Site 1 lies furthest to the north. The terrain in the area is very flat, causing water to move downstream very slowly and to spread out on the landowners' farmland.
[¶ 9] Site 1, a former farm-to-market road, is the most heavily traveled road at issue. Before October 1997, site 1 had two six-foot culverts and one five-foot culvert. According to the landowners, water occasionally backs up from the road for more than three and one-half miles, flooding more than 4,500 acres of farm and ranch land. After flooding in spring 1997, one of the six-foot culverts and the five-foot culvert were removed by the County, which then installed a ten-foot by five-foot concrete doublebox culvert to improve the flow through the site. Based on advice from its engineer, the County proposed to add a four-foot by 80-foot culvert, which it contends, along with the doublebox culvert installed in 1997 and an existing six-foot culvert, would pass a 15-year flood event when water is at the top of the roadway. The estimated cost of the improvements is $3,200.
[¶ 10] The landowners objected to this plan, alleging it would not allow water to pass quickly enough, resulting in flooding which would be higher and would last longer. The landowners proposed two different options. One option would provide for a 275-foot long "Texas crossing"[1] at an elevation of 1600.5 feet, which could be installed on either side of the existing structures. The landowners' engineer testified the Texas crossing would pass a 25-year flood event resulting in one and one-half feet of water over the road. The second option would involve the installation of an additional ten-foot by five-foot doublebox culvert that would pass a 25-year flood event.
[¶ 11] Site 2 is a minimum maintenance road at an elevation of 1603.5 feet which has three five-foot culverts and a four-foot culvert located about three to four feet above riverbed level. According to the landowners, 60 to 70 acres of land become flooded before water reaches the culvert openings. The County proposed to lower the road two feet for a distance of 200 feet, place the existing culverts at river channel bottom, install riprap on the inslopes, and install appropriate signs. Although the road currently overflows at less than a five-year flood event, the County predicts its proposal would drop the overflow elevation by one foot for a 10-year flood event, and by .7 foot for a 25-year flood event. The estimated cost of the County's proposal is $9,600.
*171 [¶ 12] The landowners want the road lowered further. The landowners' engineer proposed creating a Texas crossing by lowering the road one foot lower than the County proposed. The landowners' engineer alternatively recommended raising the road to 1606 feet and installing four six-foot culverts and one four-foot culvert. This option would successfully pass the flows only if the County would place an additional ten-foot by five-foot doublebox culvert at site 1.
[¶ 13] Site 3 is a minimum maintenance road at an elevation of 1603.6 feet, which essentially acts as a Texas crossing and has two 18-inch culverts and one four-foot culvert. Water tops the road at less than a two-year flood event. The County proposed installing a double three-foot by 40-foot culvert at riverbed level, removing the two 18-inch culverts presently in place, leaving the four-foot culvert in place, maintaining the same grade, and installing water crossing signs and riprap on the inslopes. The estimated cost of the improvements is $4,900.
[¶ 14] The landowners contend this plan does not provide sufficient relief. The landowners' engineer proposed lowering the roadway elevation to 1601 feet for adistance of 250 feet, and placing the existing culverts at river channel bottom. The landowners contended this proposal would allow water to move more efficiently and quickly, resulting in less flooded land.
[¶ 15] The road at sites 5-6 originally had two 24-foot bridges which were replaced by a 16-foot by 10-foot flat bottom arched culvert. After the arched culvert washed out in 1993, other culverts were installed and the road was lowered, but 90 to 100 acres of land have been flooded each year since then. Although the road is a minimum maintenance road, it is used by travelers during non-winter months. The County proposes to enlarge by 200 feet the existing overflow area at the present elevation of 1617.5 feet, lower an existing two-foot culvert and three-foot culvert to river channel bottom, install riprap on the inslopes, and install water crossing signs. An existing six-foot culvert and three-foot culvert are already at river channel bottom. Under the County's proposal, estimated to cost about $15,500, water flowing over the road during a 10-year flood event would be one foot deep.
[¶ 16] The landowners contend this plan also does not provide them sufficient relief. The landowners' engineer proposed lowering the road elevation three feet for a distance of 50 feet and lowering the culverts to river channel bottom. Alternatively, the landowners proposed raising the road two and one-half feet, lowering a six-foot culvert to river channel bottom, and installing a double concrete 12-foot by six-foot culvert.
[¶ 17] The total cost estimate for the County's proposals for all of the sites is $33,200. The improvements were to begin in 1999 and end in 2002,[2] with site 1 being given first priority. Although the landowners did not estimate the costs for the Texas crossings they proposed, the County was opposed to lowering the roads to those levels because of the dangers posed to motorists who might drive through flooded crossings at night. According to the County, the landowners' proposals could cost more than $100,000 to implement.

C
[¶ 18] The landowners contend the County's flood control plan is arbitrary, capricious, and unreasonable because it does not comply with the water law statutes and is not in accordance with the determination of the State Water Commission. Specifically, they contend the plan violates N.D.C.C. §§ 24-03-06 and 24-03-08, which at the time the writ of mandamus was issued, provided:

*172 24-03-06. Method of construction of highway ditches. Any and all highways of any kind hereafter constructed or reconstructed by the department, any board of county commissioners, any board of township supervisors, their contractors, subcontractors or agents, or by any individual firm or corporation, must be so designed as to permit the waters running into such ditches to drain into coulees, rivers, and lakes according to the surface and terrain where such highway or highways are constructed in accordance with scientific highway construction and engineering so as to avoid the waters flowing into and accumulating in the ditches to overflow adjacent and adjoining lands. In the construction of highways, as herein provided, the natural flow and drainage of surface waters may not be obstructed, but such water must be permitted to follow the natural course according to the surface and terrain of the particular terrain.
24-03-08. Determinations of surface water flow and appropriate highway construction. Whenever and wherever a highway under the supervision, control, and jurisdiction of the department or under the supervision, control, and jurisdiction of the board of county commissioners of any county has been or will be constructed over a watercourse or draw into which flow surface waters from farmlands, the state water commission, upon petition of the majority of landowners of the area affected, shall determine as nearly as practicable the maximum quantity of water, in terms of second feet, which such watercourse or draw may be required to carry. When such determination has been made by the state water commission, it is the duty of the department or the board of county commissioners, as the case may be, upon notification of such determination, to install a culvert or bridge of sufficient capacity to permit such maximum quantity of water to flow freely and unimpeded through such culvert or under such bridge.
[¶ 19] These water law statutes impose upon a township a duty to not construct or reconstruct township roads in a way that obstructs the natural flow and drainage of surface waters. See, e.g., Ness v. Ward County Water Resource Dist., 1998 ND 191, ¶ 14, 585 N.W.2d 793; Kadlec v. Greendale Tp. Bd. of Tp. Supervisors, 1998 ND 165, ¶ 18, 583 N.W.2d 817. When a township road is constructed or reconstructed, N.D.C.C. § 24-03-06 requires (1) the natural flow and drainage of surface waters must be permitted to follow the natural drainage pattern according to the natural terrain of the land, (2) drainage must be provided for any water that might accumulate in ditches along roadways in order to prevent overflowing onto adjoining lands, and (3) the best methods of finding the natural outlet for the surface waters must be determined by the township in accordance with good engineering practices. Ness, at ¶ 14.
[¶ 20] Nevertheless, political subdivisions have no duty to provide "perfect" drainage. Little v. Burleigh County, 82 N.W.2d 603, 613 (N.D.1957) (emphasis in original). This principle is demonstrated in Huber v. Oliver County, 1999 ND 220, 602 N.W.2d 710. In Huber, the landowners argued, because N.D.C.C. § 24-03-08 specifically provided culverts must be installed with sufficient capacity to permit the flow of the "maximum quantity of water" the watercourse "may be required to carry," the county had a duty to install culverts with sufficient capacity to withstand any type of flood event. Id. at ¶ 16. Recognizing "it is not practical or feasible to provide drainage structures sufficient to cope with the most cataclysmic of events," we rejected the landowners' unreasonable interpretation and construed "the statutes as imposing an obligation upon the County to maintain the natural flow and drainage of surface waters to the extent established engineering standards or sound engineering design practice would require as prudent under the circumstances." Id. at *173 ¶ 17. In Huber, we affirmed the County's installation of an additional culvert with capacity to protect the landowners' farm buildings and approach road from a 100-year flood event and 50-year flood event, respectively, which were well within the parameters of the Department of Transportation's design standards for stream crossing locations at North Dakota highways and secondary roads. Id. at ¶¶ 18-19. Huber illustrates there is an implied standard of reasonableness in applying N.D.C.C. §§ 24-03-06 and 24-03-08.
[¶ 21] Effective August 1, 1999, the Legislature amended N.D.C.C. §§ 24-03-06 and 24-03-08. Section 24-03-06, N.D.C.C., was amended to replace the requirement that highways be constructed in accordance with "scientific highway construction and engineering," with the phrase, "the stream crossing standards prepared by the department and the state engineer...." 1999 N.D. Sess. Laws ch. 248, § 1. The statute was also amended to provide "[i]n the construction of highways the natural flow and drainage of surface waters to the extent required to meet the stream crossing standards prepared by the department and the state engineer may not be obstructed...." Id. (amended language emphasized). The statute was further amended to protect government entities and others from liability for damages "caused to any structure or property by water detained by the highway at the crossing if the highway crossing has been constructed in accordance with the stream crossing standards prepared by the department and the state engineer." Id. Section 24-03-08, N.D.C.C., was similarly amended to delete reference to the "maximum quantity of water, in terms of second feet, which such watercourse or draw may be required to carry," and replace it with the phrase, "design discharge that the crossing is required to carry to meet the stream crossing standards prepared by the department and the state engineer." 1999 N.D. Sess. Laws ch. 248, § 2. It was further amended to prohibit damage liability "if the highway crossing has been constructed in accordance with the stream crossing standards prepared by the department and the state engineer." Id.
[¶ 22] The legislative history of the amendments reflects the reason for the changes was to promote uniformity throughout the state by having stream crossing standards prepared by the Department of Transportation and the state engineer. See Hearing on H.B. 1310 Before the Senate Political Subdivisions Committee, 56th N.D. Leg. Sess. (February 26, 1999) (testimony of State Engineer David Sprynczynatyk). Local political subdivisions were uncertain about their engineering responsibilities. Because a road cannot be engineered to take into consideration all conceivable flood events, the political subdivisions were forced to perform "a balancing act between landowners['] rights and the economics of maintaining quality roads at a price the township can afford." Hearing on H.B. 1310 Before the House Political Subdivisions Committee, 56th N.D. Leg. Sess. (January 21, 1999) (testimony of Ted D. Seibel, Wells County State's Attorney). Subsequent amendments to statutes may be used in ascertaining the legislative intent of earlier versions of the statutes. See, e.g., Effertz v. North Dakota Workers Compensation Bureau, 525 N.W.2d 691, 693 (N.D.1994). The amendments to the statutes suggest the concept of reasonableness permeates the statutory mandates, and the amendments merely assigned the responsibility for determining the measure of reasonableness to the Department of Transportation and the state engineer.
[¶ 23] The landowners argue the stream crossing standards relied upon by the County in this case are inapplicable because the pre-1999 version of the statutes controls and because the standards were not formally promulgated as rules under N.D.C.C. ch. 28-32. Assuming the landowners are correct and the prior version of the statutes governs, we find the County did not err in relying on the stream crossing *174 standards. Even though not formally promulgated as rules, those standards qualify as evidence of "established engineering standards or sound engineering design practice" under the Huber reasonableness analysis. Huber, at ¶¶ 17-18.
[¶ 24] The landowners' arguments in this case can be summarized as an attack on the reasonableness of the County's proposed flood control improvements. However, the record reflects the County's proposals would substantially meet the 15-year flood event stream crossing standard for off-system county roads in North Dakota, even though the disputed roads are only low maintenance township roads. The flow studies relied on by the landowners reasonably could be viewed as skewed by years of unusually heavy precipitation. The trial court took judicial notice of heavy rainfalls during summer 1993, heavy snows during the winter of 1996-1997, heavy flooding during spring 1997, and the wet cycle North Dakota has experienced during the 1990s. The court recognized the County should not be required to improve drainage to meet the flooding experienced in 1993 and 1997, because it would possibly result in the installation of devices required only on the Interstate highway system.
[¶ 25] The County, for the most part, rejected the landowners' recommendations of using Texas crossings, which are effective in allowing a greater amount of water to flow more quickly, because of the potential hazard to the traveling public. The court noted the landowners' alternative plans disregarded the costs of construction and the limited amount of funds available to the various township boards, which have other roads and structures to maintain.
[¶ 26] Arguably, the landowners may have a "better" plan purely in terms of draining the maximum quantity of water because their proposals would pass a 25-year flood event. However, we cannot say the County's plan is arbitrary, capricious, or unreasonable. The County balanced many considerations, including the safety of persons who use the roads, the amount of road usage, the concerns of upstream and downstream landowners, and the costs of the various plans and available funding. We conclude the County did not abuse its discretion in adopting the flood control plan, and the trial court did not err in ruling the plan complied with the writ of mandamus.

III
[¶ 27] The landowners argue the trial court erred in refusing to award them attorney fees, engineering costs and statutory costs incurred in challenging the County's flood control plan.
[¶ 28] When the unappealed writ of mandamus was issued, the trial court[3] awarded the landowners their costs and one-half their attorney fees as "damages" under N.D.C.C. § 32-34-11. The landowners claim their subsequent challenge to the County's flood control plan is merely a continuation of the mandamus proceeding and, under the law of the case doctrine, they are entitled to attorney fees and costs in this proceeding. The law of the case doctrine applies most commonly to situations where an appellate court has passed on a legal question and remanded to the trial court for further proceedings. See Brezinka v. Bystrom Bros., Inc., 403 N.W.2d 841, 843 (Minn.1987). However, this Court has analyzed the doctrine in cases which did not involve a prior appeal. See Strom-Sell v. Council for Concerned Citizens, Inc., 1999 ND 132, ¶¶ 10-14, 597 N.W.2d 414. Under the law of the case doctrine, a legal question decided by an appellate court will not be differently determined in a subsequent appeal in the same case if the facts remain the same. Matter of Estate of Schmidt, 1997 ND 244, ¶ 9, 572 N.W.2d 430.
*175 [¶ 29] When it issued the writ of mandamus, the trial court awarded the landowners $23,836.26 for one-half their attorney fees, and their engineering and statutory costs. That amount was obviously the costs incurred by the landowners in obtaining the writ of mandamus. The writ of mandamus does not state the landowners should be entitled to attorney fees and costs if they test the County's compliance with the writ at some point in the future. The trial court, when issuing the writ of mandamus, did not decide the legal question of the landowners' entitlement to attorney fees and costs in a possible future action challenging the County's compliance with the writ. Consequently, the law of the case doctrine does not apply, and does not entitle the landowners to attorney fees and costs in this proceeding.
[¶ 30] In its cross-appeal, the County argues the trial court erred in not awarding it attorney fees, costs, and disbursements as the prevailing party under N.D.C.C. § 28-26-06.
[¶ 31] The County acknowledges the absence of a statute specifically allowing an award of attorney fees in these circumstances is fatal to its request for attorney fees. See, e.g., Erway v. Deck, 1999 ND 7, ¶ 14, 588 N.W.2d 862 (holding attorney fees are not allowed to a successful litigant unless expressly authorized by statute or agreement). Under N.D.C.C. § 28-26-10, "costs may be allowed for or against either party in the discretion of the court," and the County has not established an abuse of that discretion in this case. The determination of who is a prevailing party for an award of disbursements under N.D.C.C. § 28-26-06 is a question of law on which we conduct a de novo review. Braunberger v. Interstate Engineering, Inc., 2000 ND 45, ¶ 13, 607 N.W.2d 904. Here, the trial court ultimately upheld the major portions of the County's plan, but the landowners' action to challenge the County's plan resulted in a stipulation incorporated in the judgment requiring all culverts be installed at riverbed level. This stipulation benefitted the landowners. Therefore, both sides prevailed. When each party prevails on some issues, there is no single "prevailing party" against whom disbursements may be taxed. See Earthworks, Inc. v. Sehn, 553 N.W.2d 490, 496 (N.D.1996).
[¶ 32] We conclude the trial court did not err in refusing to award any of the parties their attorney fees, costs, and disbursements.

IV
[¶ 33] The amended judgment is affirmed.
[¶ 34] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, CAROL RONNING KAPSNER, DALE V. SANDSTROM, JJ. concur.
NOTES
[1] According to the County's engineer, a "true Texas crossing" is a road built at riverbed level which allows water to pass over it freely. According to the landowners' engineer, Texas crossings create larger openings and lower the surface elevation of the water being discharged, resulting in less land being flooded. Texas crossings are not usable during periods of heavy runoff.
[2] In the event of an appeal, the court ordered the improvements begin in 2001 and be completed by 2004.
[3] The trial judge who issued the writ of mandamus was not the same judge who presided over the landowners' challenge to the County's flood control plan.