Charles **VIESTENZ** and Ingrid Viestenz, his wife, Plaintiffs and Appellants,

v.

**ARTHUR TOWNSHIP**, a Municipal Corporation of **CASS COUNTY**, North Dakota; Edward Schur, Erwin Schur and Vernon Smith as Township Supervisors of Arthur Township, Cass County, North Dakota, and Edward Schur, Clark Lincoln and Vernon Smith, individually, Defendants and Respondents.

No. 8117.

Supreme Court of North Dakota.

May 28, 1964.

Rehearing Denied July 1, 1964.

Wattam, Vogel, Vogel, Bright & Peterson, Fargo, for plaintiffs and appellants.

Lashkowitz & Lashkowitz, Fargo, for defendants and respondents.

ERICKSTAD, Judge.

This is an appeal from an order of the District Court of Cass County dated April 12, 1963, which denied an application on the part of Charles and Ingrid Viestenz for an order requiring the defendants to comply with the mandatory injunction heretofore entered in this case.

In 1950 the present petitioners as plaintiffs brought an action against the township and its supervisors, alleging that the township had reconstructed certain public highways bordering the plaintiffs' property in such a manner that the highways obstructed the natural flow and drainage of surface water, causing flooding of the plaintiffs' land. The plaintiffs asked that the township be permanently enjoined from obstructing the natural and free flowage of surface water over, upon, and across their land and that it be further enjoined from permitting surface water flowing into and accumulating in the ditches of the said public highways to overflow the plaintiffs' adjacent land. The district court refused to grant the permanent injunction, vacated the temporary injunction which it had granted, and dismissed the plaintiffs' complaint.

On appeal the majority of this court concluded its opinion as follows:

"The plaintiffs are therefore entitled to an injunction restraining the defendants from maintaining the highways along plaintiffs' land in such a manner as to impound surface waters on their land. They are also entitled to a mandatory injunction directing the defendants to construct or alter the highway grades or ditches, or both, so as to provide for the outlet of surface waters from the plaintiffs' land and prevent the recurrent overflow of the land herein involved by waters flowing in or accumulating in the highway ditches.

"There is some evidence that an outlet for the accumulated waters may be obtained by placing a culvert through the embankment of the east and west highway at the southeast corner of plaintiffs' land and deepening the ditch toward the south along the section line.

"The evidence also indicates that if the plaintiffs' private driveway, which appears to have been constructed without authority, is removed, the ditch towards the north from the southeast

corner of plaintiffs' land along the east side of their land may be deepened through the east-west ridge to provide an outlet towards the natural drainage to the north and east.

"The best method, however, of finding an outlet for these waters must be determined by the township board in accordance with good engineering practices as provided in Sec. 24-0633, ND RC 1943. See also Ritter v. Drainage District No. 1, 148 Neb. 873, 29 N.W.2d 782, 788.

"The judgment of the District Court is reversed and the case remanded for further proceedings in accordance herewith." Viestenz v. Arthur Tp., 78 N.D. 1029, 54 N.W.2d 572.

Pursuant to this opinion judgment on remittitur was entered by the Clerk of District Court of Cass County on August 27, 1952. The pertinent paragraphs read as follows:

"2. That the above named defendants, their officers, servants, agents and employees be permanently enjoined from maintaining the highway located and situated adjacent to and along the plaintiffs' land described as the South Half (S½) of Section Twenty-one (21), Township One Hundred Forty-two (142), Range Fifty-two (52), Cass County, North Dakota in such a manner so as to impound surface waters on said land; and the said defendants, their officers, servants, agents and employees are further permanently enjoined from in any manner obstructing the natural and free flowage of surface waters over, upon and across the lands of the said plaintiffs above described and the said defendants, their officers, servants, agents, employees are further permanently enjoined from permitting surface waters flowing into and accumulating in the said ditches of said public highways so as to overflow and become impounded on the said plaintiffs' land above described.

"3. That said defendants, their officers, servants, agents and employees shall forthwith construct or alter the highway grades or ditches, or both located and situated adjacent to said plaintiffs' lands above described so as to provide for the outlet of surface waters from the said plaintiffs' land and so as to prevent the recurrent overflow of the said lands above described by waters flowing in or accumulating in the said highway ditches; and said defendants, their officers, servants, agents and employees are further ordered to forthwith construct said highway and ditches so as to permit the free flowage of surface waters according to the natural courses of the surface and terrain of the area in which the plaintiffs' lands are located, in accordance with good engineering practices as provided by law."

The injunction which it is sought to enforce was indefinite in its provisions, in that it was left to the township board to make provision that plaintiffs' land should not be flooded by the obstruction of the natural flow of surface waters through the adoption of good engineering practices.

 It is contended that the means adopted by the board in an attempt to comply with the injunction have not been effective and do not constitute good engineering practices, and that the only effective way of preventing plaintiffs' land from being flooded by the obstruction of the natural flow of surface waters and thus comply with the injunction is to reestablish the natural flow of such waters. An order directing defendants to take such action is therefore requested. Such a proceeding is appropriate, as the court has continuing jurisdiction for the purpose of enforcing and making. the permanent injunction effective. Halsrud v. Brodale, 247 Iowa 1047, 77 N.W.2d 922.

The question thus submitted is a question of fact.

 To provide the proper factual background we quote from the 1952 opinion of the majority of this court, as follows:

"The evidence shows that the plaintiffs are, and have for the last five, years been the owners of the S½ of Sec. 21, Township 142, Range 52 in Arthur Township, Cass County, North Dakota. This is farm land located about twenty miles west of the Red River where the terrain generally is flat and level. A township road had some years ago been graded east and west along the south edge of plaintiffs' land, a distance of one mile. This roadway was rebuilt in the late summer of 1950. No culverts were used in the construction of that roadway. In 1946 a ditch and an embankment were constructed on the section line north and south on the east side of plaintiffs' land, jointly by the Soil Conservation Service and the defendants. That embankment was formed into a roadway and joined the east-west roadway at the southeast corner of the plaintiffs' land forming there a square corner. No outlet for any water accumulating there was provided.

"The plaintiffs' buildings are located on the Southeast Quarter (SE¼) of plaintiffs' land just east of the quarter line. About 800 feet north of the southeast corner of plaintiffs' land is a low ridge which extends southwest across the south half of plaintiffs' land north of their buildings. At the east side of plaintiffs' land the crest of this elevation or ridge is twenty inches higher than plaintiffs' southeast corner. The evidence shows that the natural drainage of plaintiffs' land south of this ridge is to the south and east. North of that ridge the drainage is north and east. This elevation or ridge is the divide of the drainage on his land.

"There is another elevation or ridge commencing about fifty rods north of

plaintiffs' buildings and north of the east-west ridge which runs north and a little east across the western edge of the Northwest Quarter (NW¼) of the Southeast Quarter (SE¼) of plaintiffs' land. There is a break or washout between the two ridges.

"The west portion of plaintiffs' land north of the divide is quite flat and lower than the portion east of the north-south ridge. In the fall of 1948 plaintiffs had a ditch dug to drain that portion of their land. That ditch commenced in the northwest corner and angled southeast through the washout between the ridges and then 'kind of makes a turn' northeast on the north side of the east-west ridge. They had that ditch deepened in 1949 so that at its deepest point in the washout between the ridges it was four feet deep. Generally the ditch was only one and a half or two feet deep and eight to ten feet wide. It drains the water on plaintiffs' land north of the east-west ridge into the north and south ditch east of plaintiffs' land. The water then flows north along that ditch to a culvert near the northeast corner of the defendants' [plaintiffs'] land and through it to a natural drainway.

"The evidence shows that about thirty rods west of plaintiffs' southeast corner there are two small potholes which have always been filled with water covering an area of from one to two acres each. Outside of that no noticeable amount of water had accumulated in that corner until after the embankment on the east side of plaintiffs' land was constructed. Before that time the water had drained into sloughs south and east of plaintiffs' corner. Mr. Bradsteen, the engineer in charge, warned the township board at the time of building that north-south grade that unless a culvert were put in where the two embankments joined water would collect there. At one time the township board au-

thorized the placing of a culvert there but afterwards countermanded that order. Since that north-south embankment was constructed plaintiffs claim that from twenty to forty acres of their lands were covered with water every spring until July and made useless for raising grain.

"The defendants claim that as the water from the northwest part of plaintiffs' land flowing in their private ditch came to the north side of the east-west ridge it spilled over that ridge and drained towards the southeast corner of their land to cause the accumulation of that water. Both the plaintiff, Charles Viestenz and Bradsteen, field man and surveyor of the Soil Conservation Service, who had made the surveys for plaintiffs' ditch, testified that a big head of water from the north and west could spill over the east-west ridge. However, the plaintiff, Charles Viestenz, who lives just south of the east-west ridge and naturally most interested in the flow of this water, said he had never seen such an overflow. Defendants' witnesses said they believed the water had overflowed but there was no positive testimony that it had. Bradsteen testified that the ditch could in no way cause such overflow. The ditch itself from one and one-half to four feet deep, eight to ten feet wide and fully a mile long would hold considerable water and lower the general level of the water coming towards the ridge from the north that much. To that extent the ditch would lessen the danger of an overflow. Furthermore, the ditch would expedite the flow of the water north of the ridge into the east highway ditch. Clearly the plaintiff's private ditch instead of causing an overflow of the water over the east-west ridge would tend to prevent that.

"Furthermore, the plaintiffs had, prior to the digging of the ditch built dikes eighty rods each way along the northwest corner of their land to pre-

vent the waters from the west and north from accumulating on that low lying section of their land. Then in 1950 a soil conservation ditch and embankment had been constructed north and south along the west boundary of plaintiffs' land for the purpose of draining the water from the west towards the north and away from plaintiffs' land. This indicates that the plaintiffs, instead of causing drainage towards the southeast portion of plaintiffs' land did everything possible to lessen the danger of the water draining that way.

"Defendants also claim that the plaintiffs' private driveway over the ditch on the east side of plaintiffs' land is responsible for this accumulation of water. That driveway is located at the crest of the east-west ridge. It was built on July 3, 1950, just three months before this action was started. All of the water in the southeast corner of which plaintiffs complain had accumulated prior thereto. That private driveway, located as it was on the crest of the ridge, could in no way affect the accumulation of water on plaintiffs' land. The water on the north side flowed north and only the natural drainage on the 800 foot south slope of the ridge could run south. The plaintiffs' private driveway could have no effect on that.

"The evidence shows that there was an unusual amount of surface water in the spring of 1950 caused by an extra fall of snow and rain. That, however, would have no bearing on the issues here involved unless the surface waters north of the east-west ridge were sufficiently increased to cause them to overflow the ridge and that such overflow was due to the plaintiffs' private ditch. There is no evidence of such an overflow.

"Defendants' witnesses admit that the road embankments act as dikes around that southeast corner and hold the water accumulating in the ditches and cause it to overflow on plaintiffs' land. The defendants concede that the natural drainage from that corner of plaintiffs' land is south and east. As a result the natural flow of surface water has been obstructed at the southeast corner of plaintiffs' land. The plaintiffs by their conduct have not augmented the quantity or accelerated the flow of surface water toward the southeast corner. Solely because of the obstructions created by the township grades water accumulates on and damages the plaintiffs' land and results in the exact situation which Chapter 325, SLND 1945, Sec. 24–0633, 1949 Supp. to NDRC 1943 is intended to prevent. That law specifically enjoins road constructing officials to construct highways 'so as to avoid the waters flowing into and accumulating in the ditches to overflow adjacent and adjoining lands.' It further provides: 'It is the intention of this act that in the construction of highways, as herein provided, the natural flow and drainage of surface waters shall not be obstructed, but that such water shall be permitted to follow the natural courses according to the surface and terrain of the particular terrain.'

"It follows that the action of the township board in so constructing the highways as to permit the accumulation of waters in the ditches to overflow plaintiffs' land was in violation of the law." Viestenz v. Arthur Tp., 78 N.D. 1029, 54 N.W.2d 572.

Following the entry of the judgment on remittitur the defendant township in September of 1952 employed Max R. Hughes, an engineer, to recommend methods of complying therewith.

Mr. Hughes apparently suggested two methods of draining the land.

The first method involved cleaning and deepening the drainage ditch paralleling

the road from the southeast corner of Section 21 north to the coulee and the coulee bed to the northwest 300 to 500 feet. This plan also required the removal of the driveway in the Southeast Quarter of Section 21 at the point where the east-west ridge intersected the north-south road.

The second method required the placing of a culvert across the east-west road between Section 21 and Section 28 west of the point where the north-south road intersected the east-west road at the southeast corner of Section 21 and the deepening of the road ditch channel southward through the next mile.

Mr. Hughes recommended the adoption of the first method, and this plan was carried out except for the deepening of the coulee bed.

This apparently adequately drained the plaintiffs' land until the heavy rains of 1962, when their land was again flooded.

At the hearing in March of 1962 on the application to enforce the court's mandatory injunction of 1952 by ordering the construction of a culvert beneath the east-west road bordering the south end of the plaintiffs' property, the plaintiff Charles Viestenz testified as follows:

"Q. Following the trial and appeal of the first action, what if any, action was taken by the township board with reference to providing drainage of water off your land?

"A. They deepened the ditch from the southeast corner north.

"Q. And that is indicated by the wavy line you have drawn in on the east side of your property?

"A. That's right.

"Q. When was that done?

"A. The fall, I believe it was the fall of '52. Was it '51 or '52?

"Q. Now subsequent to the deepening of that ditch by the township board did you have standing water in the southeast quarter of your land the next spring?

"A. After they dug the ditch?

"Q. After they dug the ditch.

"A. No, there was very little water trouble the next year.

"Q. Did you have a normal amount of rainfall?

"A. I would say it was less than normal.

"Q. What about 1953?

"A. Well, there was no water trouble.

"Q. When was the first time that you had any water difficulty in that area south of the ridge you have indicated on that map?

"A. In the spring of '62.

"Q. Would you now explain to the Court what happened with reference to the water on your land in the spring of '62?

"A. It filled in on that area south of the ridge there east of the buildings.

"Q. Would you go over and mark that area?

"A. (witness indicating)

"Q. Now you have testified, Mr. Viestenz, that based upon your experience in farming this land that the water which falls on the south side of this ridge runs to the south and to the east, is that correct?

"A. Yes.

"Q. As a result of the deepening of this ditch in the spring of '62 did you observe any water in the ditch running on the west side of the north-south road?

"A. The water ran south in that ditch.

"Q. The ditch then that was dug by the county and runs north and south on the west side of the road and on the east side of your property was running from the north to the south, is that correct?

"A. Didn't you mean township road instead of county?

"Q. I meant township, yes.

"A. It was running south instead of north.

"Q. Where was it going?

"A. Proceeding from the corner to the west and filling that area on the north side of the road.

\* \* \* \* \* \*

"Q. (By Mr. Vogel) Mr. Viestenz, the day you took these pictures they show water in the ditch on the north of this east-west road. Did you observe water in the ditch on the south side of this east-west road?

"A. Yes.

"Q. What observation did you make with regard to relative heights of the water in the two ditches?

"A. Fourteen inches higher.

"Q. Where?

"A. On the north side of the road than it was on the south side of the road.

"Q. Fourteen inches?

"A. Fourteen inches higher."

Lewis Viestenz, brother of the plaintiff Charles Viestenz, testified that in 1962 he also saw the water from north of the ridge drain toward the south in the ditch along the west side of the north-south road east of the plaintiffs' land.

Neither plaintiff Charles Viestenz's testimony nor his brother's testimony in this regard was contradicted by any of the defendants' witnesses.

Testimony on behalf of the defendants is that the plaintiffs have driven farm machinery across the north-south ditch and that soil has drifted into it, causing the ditch to be partially filled with soil.

Frank Richard, an engineer employed by Charles Viestenz to make a survey of the land in question, testified that there was not enough difference in elevation between the flooded area and the coulee for the water in the flooded area to drain north into the coulee. This was contradicted by E. L. Pratt, an engineer who surveyed the area for the defendants. He said that much land in the locality was being drained with less difference in grade, although he admitted that the difference in elevation between the two points was less than the minimum drop necessary to get adequate drainage. He contended that the recommended minimum drop was not available anywhere in the county. His view was that plaintiffs' land could be adequately drained by removing the soil which had accumulated in the ditch in the ten-year period.

Although the engineers differed as to what plan would adequately drain the plaintiffs' land, it appears that digging the ditch through the natural ridge which intersects the north-south road approximately eight hundred feet north of the southeast corner of Section 21 has aggravated the drainage problem and caused surface water which would naturally flow to the north to flow to the south in times of excess run-off.

The statute which controlled when this matter was first considered reads as follows:

"24–0633. Method of Construction of Highway Ditches. That any and all highways of any kind hereafter constructed or reconstructed by the State Highway Department, any board of county commissioners, any board of township supervisors, their contractors, sub-contractors or agents, or by any individual, firm or corporation, shall be so designed as to permit the waters running into such ditches to drain into coulees, rivers and lakes ac-

cording to the surface and terrain where such highway or highways are constructed in accordance with scientific highway construction and engineering so as to avoid the waters flowing into and accumulating in the ditches to overflow adjacent and adjoining lands. It is the intention of this act that in the construction of highways as herein provided, the natural flow and drainage of surface waters shall not be obstructed, but that such water shall be permitted to follow the natural courses according to the surface and terrain of the particular terrain. (Approved March 12, 1945.)" North Dakota Revised Code of 1943, 1949 Supplement.

The aforesaid statute was repealed and reenacted almost verbatim in 1953. Said law is now contained in Section 24–03–06 of the North Dakota Century Code and reads as follows:

"24–03–06. Method of construction of highway ditches.—Any and all highways of any kind hereafter constructed or reconstructed by the department, any board of county commissioners, any board of township supervisors, their contractors, subcontractors or agents, or by any individual firm or corporation, shall be so designed as to permit the waters running into such ditches to drain into coulees, rivers, and lakes according to the surface and terrain where such highway or highways are constructed in accordance with scientific highway construction and engineering so as to avoid the waters flowing into and accumulating in the ditches to overflow adjacent and adjoining lands. In the construction of highways, as herein provided, the natural flow and drainage of surface waters shall not be obstructed, but such water shall be permitted to follow the natural course according to the surface and terrain of that particular terrain."

Having reviewed the record and the mandatory injunction of the district court granted in 1952 in light of the controlling law, we conclude that the petitioners-plaintiffs herein are entitled to an order enforcing the said mandatory injunction, which would require the defendants forthwith to construct the township highways which border the petitioners-plaintiffs' land on the south and on the east so that the highways do not obstruct the natural flow of surface waters to the south and east.

The district court's order of April 22, 1963, is therefore set aside, and the case is remanded with instructions to the district court to issue an order in conformity with this decision.

MORRIS, C. J., and STRUTZ, TEIGEN and BURKE, JJ., concur.